# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

3M COMPANY, a Delaware
corporation, and 3M INNOVATIVE
PROPERTIES COMPANY, a Delaware
corporation,

        Plaintiffs,

        v.

Pradeep Mohan,

        Defendant.

**FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND
ORDER FOR JUDGMENT**
Civil No. 09-1413 ADM/FLN

---

Allen W. Hinderaker, Esq., Merchant & Gould P.C., Minneapolis, MN and Hildy Bowbeer, Esq.,
3M Innovative Properties Company, St. Paul, MN, on behalf of Plaintiffs.

Pradeep Mohan, *pro se*.

---

## I. INTRODUCTION

The above-titled matter was tried as a court trial before the undersigned United States

District Judge beginning on October 4, 2010 and concluding with closing arguments on October

8, 2010. Plaintiffs 3M Company ("3M") and 3M Innovative Properties Company's ("3M IPC")

(collectively, "Plaintiffs") claim trademark infringement, injunctive relief, statutory damages,

and attorneys fees against Pradeep Mohan ("Defendant"). A prior order decided [Docket No.

151] that: 1) 3M IPC's U.S. Patent No. 5,449,865 entitled "Ear Tips Having Molded-In

Recesses for Attachment to A Stethoscope ("the '865 patent") is valid; 2) Defendant has

infringed the '865 patent; 3) 3M's MASTER CARDIOLOGY and CARDIOLOGY III

trademarks are valid, suggestive, and entitled to trademark protection; and 4) Defendant's

counterclaims for deceptive trade practices and tortious interference with contract were dismissed. Therefore, the issues tried were Plaintiffs' claims for: 1) trademark infringement under the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125; 2) permanent injunctive relief with respect to the alleged trademark infringement; 3) permanent injunctive relief with respect to the '865 patent; 4) statutory damages under 15 U.S.C. § 1117(c), and attorneys fees under 15 U.S.C. § 1117(a) and 15 U.S.C. § 1117(b). After five days of trial and hearing the testimony of fourteen witnesses, the Court finds in favor of Plaintiffs on their claims for trademark infringement, permanent injunctive relief, and attorneys fees and costs. However, the Court finds that the Seventh Amendment requires a jury determination on the issue of statutory damages under the Lanham Act.

## II. FINDINGS OF FACT

### A. The Parties

1. Plaintiffs are organized under the laws of the state of Delaware. Plaintiffs' principal place of business is in St. Paul, Minnesota. 3M owns the rights to the trademarks at issue in this case. 3M IPC owns the '865 patent, for which 3M is the exclusive licensee.

2. Defendant sells stethoscopes over the Internet. Defendant resides in Santa Cruz, California and has done business under the business names "Kila," "Kila Labs," "Kila Scopes," and "Lautenn." Pls. Ex. 452.

3. Defendant has sold stethoscopes on his three websites: kila.com; kilalabs.com; and kilascopes.com. Defendant has also sold stethoscopes on eBay.com ("eBay") and Amazon.com ("Amazon"). Id.

4. Plaintiffs' trademark infringement and remedies claims arise from Defendant's activities relating to stethoscope sales via his websites, eBay, and Amazon.

**B. 3M LITTMANN Stethoscopes**

**1. Background**

5. In 1963, Dr. David Littmann, a cardiologist and Harvard Medical School professor, invented and patented a mechanical stethoscope with improved acoustics. 3M acquired the LITTMANN brand from Dr. Littmann in 1967, and has sold stethoscopes under the LITTMANN brand name for over 40 years. Pls. Ex. 46.

6. Doctors, nurses, and other medical professionals[1] use stethoscopes to hear heart sounds and other body sounds. Medical professionals are trained to listen for specific heart and body sounds, which occur over a range of frequencies. Stethoscopes are designed to amplify these frequencies so medical professionals can hear and identify specific heart and body sounds. The sounds that indicate heart pathologies, for example, occur at low frequencies, which are the most difficult frequencies for humans to hear. Medical professionals rely on stethoscopes to enhance these low-frequency sounds, allowing them to hear sounds that might indicate serious heart disease. Consequently, the quality of a stethoscope's acoustical performance at low frequencies is important for both medical professionals and patients. Pls. Exs. 45, 222, 224.

7. Traditional stethoscopes are dual-sided, meaning that the head of the stethoscope, called the "chestpiece," has two sides. One side of the chestpiece is called the "bell" side, which

---

[1] For simplicity, the Court will collectively refer to doctors, nurses, cardiologists, general practitioners, specialists, pediatricians, medical students, residents, nursing students, physician assistants, nurse practitioners, paramedics, EMTs, veterinarians, institutional and government employees, and other medical professionals as "medical professionals."

is best for discerning low-frequency sounds. The other side is called the "diaphragm"[2] side, which is best for listening to high-frequency sounds.

8. In the late 1980s, 3M invented a one-sided "tunable" stethoscope. This tunable stethoscope incorporated a design that enables users to switch between "bell" mode and "diaphragm" mode (and therefore between low and high frequencies) by varying the pressure applied to the chestpiece when pressed on a patient's body. A medical professional using a tunable stethoscope does not have to turn the chestpiece over to alternate between listening for low and high frequency sounds. Pls. Exs. 13, 222.

9. 3M sells what it calls a "family of stethoscopes" under the LITTMANN brand. The 3M family includes at least two electronic stethoscopes and at least eight mechanical stethoscopes ranging from premium acoustical quality to basic acoustical quality. Pls. Exs. 13, 142. Although electronic stethoscopes provide sound quality that surpasses mechanical stethoscope acoustics, the vast majority of stethoscopes used by medical professionals today are mechanical stethoscopes. See, e.g., Pls. Ex. 34.

### 2. 3M's Stethoscope Trademarks

10. The stethoscopes at issue are two of 3M's top-of-the-line mechanical stethoscopes, the LITTMANN sub-brands MASTER CARDIOLOGY and CARDIOLOGY III. Like all LITTMANN stethoscopes, both the MASTER CARDIOLOGY and CARDIOLOGY III

---

[2] In the context of stethoscopes, the word "diaphragm" has more than one meaning. Pls. Ex. 15. As just described, the diaphragm is the larger side of a double-sided chestpiece. As later discussed, the diaphragm is also a firm disc made from a plastic composite. Id. These diaphragms, which often bear manufacturer logos, are attached to the larger side of a double-sided stethoscope or attached to the only side of a single-sided stethoscope. See, e.g., Pls. Exs. 16, 27. All LITTMANN stethoscopes have diaphragms of the latter definition featuring a LITTMANN logo with a large cursive letter "L". Id.; see, infra, Figure 1.

stethoscopes are branded with both the 3M and LITTMANN brands.  The brands are displayed on the chestpieces of the stethoscopes, as well as on the packaging and accessories.  Pls. Exs. 16, 27.

11.  The United States Patent and Trademark Office ("PTO") issued U.S. Trademark Registration Nos. 2,097,658 and 2,097,659 for use of the 3M trademark on stethoscopes on September 16, 1997.  The marks were renewed for a 10-year term in 2007.  Pls. Exs. 17, 18.

12.  The PTO issued U.S. Trademark Registration Nos. 751,809 and 2,683,822 for use of the LITTMANN word mark on stethoscopes.  These registrations were granted on June 25, 1963 (last renewed in 2003 for a 10-year term), and February 4, 2003, respectively.  Pls. Exs. 1, 2.

13.  The MASTER CARDIOLOGY and CARDIOLOGY III stethoscopes, as well as all other LITTMANN stethoscopes, are branded with the LITTMANN QUALITY Stylized L registered trademark:



**Figure 1**

14.  3M has sold stethoscopes bearing this mark since February 1988.  The PTO issued U.S. Trademark Registration No. 2,681,330 for use of this mark on stethoscopes on January 28, 2003.  Pls. Ex. 3.

15.  3M also trademarked the Stylized L design mark without the words "LITTMANN" and "QUALITY" within the mark's concentric circles:



**Figure 2**

16.  On November 28, 1989, the PTO issued U.S. Trademark Registration No. 1,568,178 for use of this Stylized L mark on stethoscopes.  The mark was renewed for a 10-year term on November 28, 2009.  Pls. Ex. 4.

17.  3M introduced the MASTER CARDIOLOGY stethoscope in 1987.  The MASTER CARDIOLOGY stethoscope featured Plaintiffs' newly-invented tunable technology, and was the only high-quality, single-sided stethoscope on the market during the late 1980s.  Pls. Exs. 37, 40, 41, 45.  To further enhance its distinctiveness and increase customer recognition, 3M designed a uniquely-shaped chestpiece for the MASTER CARDIOLOGY stethoscope:



**Figure 3**

On March 5, 1985, 3M obtained a design patent for the chestpiece configuration.  Pls. Ex. 165. Additionally, the PTO issued U.S. Trademark Registration No. 2,486,748 for the configuration or shape of the MASTER CARDIOLOGY chestpiece on September 11, 2001, noting that the chestpiece configuration first appeared in commerce in 1987.  Pls. Ex. 20.

18.  On June 19, 2007, the PTO issued U.S. Trademark Registration No. 3,253,234 for the word mark "MASTER CARDIOLOGY," stating that the MASTER CARDIOLOGY mark was first used in commerce in 1987.  Pls. Ex. 19.  3M Marketing and Communications Director

6

Dawn McGinley testified that MASTER CARDIOLOGY marketing materials prominently and intentionally feature the distinctive MASTER CARDIOLOGY chestpiece.  See id.  Today, 3M continues to market the MASTER CARDIOLOGY stethoscope as LITTMANN's highest-performing, most prestigious (and most expensive) mechanical stethoscope.  See, e.g., Pls. Exs. 26, 43, 48.

19.  The CARDIOLOGY III's performance is a step below the MASTER CARDIOLOGY.  However, the CARDIOLOGY III stethoscope, unlike the MASTER CARDIOLOGY, is adaptable for use on pediatric patients as well as adult patients.  The CARDIOLOGY III is adaptable because, like a traditional stethoscope, its chestpiece has two sides. Unlike a traditional stethoscope, though, both sides are tunable.  One side of the chestpiece is larger and meant for adult patients, while the smaller side is designed for children and thin patients.  Pls. Ex. 13.

20.  3M introduced the CARDIOLOGY III stethoscope in 1997 as a successor to its CARDIOLOGY II stethoscope.  The PTO issued Registration No. 3,619,324 for the CARDIOLOGY III word mark on May 12, 2009, noting that the mark was first used in commerce in August of 1997.  Pls. Ex. 28.

**3. 3M LITTMANN Stethoscopes' Status in the Marketplace**

*a. LITTMANN Image Among Medical Professionals*

21.  LITTMANN stethoscopes are well known among medical professionals for superior acoustical quality.  This sound quality is known as the "LITTMANN sound."  The "LITTMANN sound" is the loudness and clarity of heart and body sounds provided by a LITTMANN stethoscope, which allows users to distinguish subtle sounds that may indicate disease.  Pls. Ex. 51.  A 2008 double-blind survey sponsored by 3M found that sound quality is by far the most

important factor for stethoscope consumers. The LITTMANN brand is extremely strong in the stethoscope market, having captured 70% of overall sales in recent years. 3M sells over half a million LITTMANN stethoscopes each year, earning tens of millions of dollars annually. Pls. Ex. 34.

22. 3M's brand-recognition research shows that over 96% of medical professionals in the U.S. have heard of LITTMANN brand stethoscopes. Pls. Ex. 58. Furthermore, 3M's market research found that LITTMANN engenders strong customer loyalty; 90% of customers who have owned a LITTMANN stethoscope choose LITTMANN for subsequent stethoscope purchases. Pls. Ex. 31.

23. LITTMANN stethoscopes are also known for high-quality materials and manufacturing, as well as multi-year warranties. The MASTER CARDIOLOGY stethoscope has a seven-year warranty; the CARDIOLOGY III stethoscope has a five-year warranty. Additionally, 3M offers a lifetime service center for stethoscope repair, trade-in, and refurbishment. Pls. Exs. 13, 51. "LITTMANN for Life" is one of the brand's marketing taglines. Pls. Ex. 32.

24. It is undisputed that the LITTMANN brand is popular with medical professionals and known for excellent acoustical performance. Defendant's sole witness, Marilyn Hedstrand ("Hedstrand"), a nurse who teaches students in the Bethel University Nursing Department, testified that she restricts her students to use of stethoscopes that are at least equal in acoustical quality to a LITTMANN Classic II SE stethoscope. Hedstrand further testified that she owns a LITTMANN CARDIOLOGY III stethoscope for her personal use.

25. LITTMANN market research has found that medical professionals believe the LITTMANN "L" visible on the chestpiece of a LITTMANN stethoscope connotes status, and

further found that many medical and nursing students equate purchase of a LITTMANN stethoscope with a feeling that they have "arrived."  See, e.g., Pls. Ex. 31.

### b. LITTMANN Stethoscope Sales

26.  The CARDIOLOGY III stethoscope, with a suggested retail price of slightly over $200, has been one of LITTMANN's top three sellers for the past five years.  The more expensive MASTER CARDIOLOGY stethoscope, with a suggested retail price of approximately $250, has not been one of the top sellers by volume.  However, both the CARDIOLOGY III and MASTER CARDIOLOGY stethoscope have been in the top three in terms of dollar sales for the past five years.  Pls. Ex. 34.  Moreover, in a 2006 survey of LITTMANN stethoscope owners, 80% reported they most often used either a MASTER CARDIOLOGY or CARDIOLOGY III stethoscope.  Pls. Ex. 69.  In 2009, 3M sold tens of thousands of CARDIOLOGY III and MASTER CARDIOLOGY stethoscopes in the U.S., resulting in over $15 million in sales.  Pls. Ex. 34.

### c. LITTMANN Stethoscopes in the Media

27.  LITTMANN stethoscopes are frequently seen on television shows and in movies featuring doctors, nurses or hospital settings.  3M has never paid for these product placements; instead, prop masters have requested LITTMANN stethoscopes.  For example, many of the actors on the medical drama "Grey's Anatomy" have a LITTMANN brand stethoscope engraved with their name.  LITTMANN stethoscopes have also appeared in the television shows "General Hospital," "ER," "Chicago Hope," "Touched by an Angel," "NYPD Blue," and others. LITTMANN stethoscopes have appeared in the movies "Multiplicity," "Thinner," "Mars Attack,"and others over the years.  See Pls. Ex. 55.

28.  In 2009, LITTMANN stethoscopes were featured in the print publications Popular

Science, USA Today, AARP Magazine, Wireless News, The Stamford Advocate, Advanced Medical, Medical Device Daily, Minneapolis Star Tribune, Twin Cities Business Journal, and Pioneer Press. Pls. Exs. 85, 85-1, 136, 451. Also in 2009, LITTMANN was mentioned on the Internet sites CNET.com, MinnPost.com, MedCityNews.com and Coolestgadgets.com, as well as radio stations WWJ-AM (Detroit), WCCO-AM (Minneapolis), KMOX-AM (St. Louis), KCBS-AM (San Francisco), and KIRO-FM (Seattle). Pls. Exs. 85, 85-1.

**4. The Internet as a Channel of Trade for LITTMANN Stethoscopes**

29. The majority of LITTMANN stethoscopes are sold through wholesalers and direct dealers. Wholesalers provide stethoscopes to online retailers and retail stores, while direct dealers sell stethoscopes directly to schools, hospitals, and individual consumers through a variety of channels. 3M works with nearly 300 authorized wholesalers and direct dealers. Visitors to www.3m.com and www.littmann.com who wish to purchase a LITTMANN stethoscope are provided with links to websites belonging to a group of authorized distributors. Pls. Ex. 86. In addition, 3M sells stethoscopes directly to consumers at trade show events. Pls. Exs. 63, 64, 64-1, 65, 66, 67, 68, 71.

30. Although LITTMANN stethoscopes are sold through a variety of channels, the Internet is by far the fastest-growing retail channel. Ned Hancock ("Hancock"), 3M Global Sales and Marketing Manager for Patient Assessment Products in the Infection Prevention Division, testified that the Internet currently accounts for approximately 50% of all LITTMANN stethoscope sales. Many LITTMANN dealers are wholly Internet-based, and most retailers with "brick and mortar" locations also sell stethoscopes through the Internet. 3M's authorized distributors advertise and promote LITTMANN and 3M trademarks in conjunction with authorized LITTMANN stethoscope sales.

31.  3M began marketing LITTMANN stethoscopes on the Internet as early as 1995.  Pls. Ex. 56.   Since 1998, 3M has annually spent at least half a million dollars on LITTMANN stethoscope advertising and marketing.  Pls. Ex. 36.  Today, with the exception of trade shows, almost all of 3M's LITTMANN advertising and marketing funds are dedicated to the Internet.  See, e.g., Pls. Exs. 32, 33.  In 2009 alone, 3M spent more than $1 million on LITTMANN advertising and marketing; the vast majority of this sum was for Internet marketing.  Id.; see, e.g., Pls. Ex. 31.

32.  Hancock testified that a strong brand reputation is extremely important in Internet sales because customers cannot examine the physical stethoscope prior to purchase.  Stethoscope customers use brand trust as a proxy for merchandise quality.  As medical instruments, stethoscope quality is particularly important, as both patients and medical professionals rely on their performance for accurate medical diagnoses.  Accordingly, 3M spends considerable resources protecting the LITTMANN brand in the online marketplace.

## C.  Defendant's Activities

### 1.  Online Sales

33.  3M Assistant Chief Intellectual Property Counsel James Voegeli ("Voegeli") testified that Hancock brought Defendant's online stethoscope sales activity to Voegeli's attention in late 2008.   After reviewing Defendant's activities, Voegeli sent him a cease-and-desist letter dated October 31, 2008.  The letter advised Defendant that the use of 3M and LITTMANN marks on Defendant's website were unauthorized and infringed 3M's trademark rights.  Pls. Ex. 143.  As of October 31, 2008, Defendant's Kila Labs website contained images and words that were either identical to or similar to the following trademarks owned by 3M: 1)

the 3M Corporate logo; 2) the LITTMANN word mark; 3) the LITTMANN QUALITY Stylized

L design mark; 4) the Stylized L design mark; 5) CARDIOLOGY III word mark; and 6) the

MASTER CARDIOLOGY chestpiece configuration mark.  Pls. Ex. 144.

34.  Defendant's website included Kila Labs logos consisting of a large cursive letter "K"

contained within two concentric circles.  The words "KILA LABS" or "KILA," together with the

word "EXCELLENCE," are inserted within the outer ring created by the two concentric circles.

See, infra, Figures 4-7.  3M contends these logos are confusingly similar to 3M's circular

LITTMANN design logos.  See, supra, Figures 1-2; compare, infra, Figures 4-7.  Voegeli's letter

stated, in part:

> We believe that Kila Labs' use of its logo is deliberately designed
> to mimic and simulate the L LITTMANN and Design logo.  The
> layout and design of the logo, and use of a cursive "K" that
> simulates the cursive "L", clearly mirror design and layout
> elements of the L LITTMANN and Design logo and the L and
> Design logo.  3M's concerns are further heightened in light of the
> other infringements listed in this letter, which appear to indicate a
> pattern of intentionally seeking to trade off the good will of 3M an
> (sic) its trademarks . . . .

Pls. Ex. 143.






|              |              |              |
| :----------: | :----------: | :----------: |
| **Figure 4**<br>**Figure 7** | **Figure 5** | **Figure 6** |

35.  As of October 31, 2008, according to screenshots of Defendant's website, Figure 4 was most prominently displayed on the website's banner.  Pls. Ex. 144.  Figure 5 was displayed within the "stethoscope basics" web page.  Id.  Figure 6 depicts the diaphragm of the single-sided stethoscope Defendant was selling as the "KS-430 Single Head Stethoscope" as of October 31, 2008.  Id.  Finally, Figure 7 shows the chestpiece of what Defendant repeatedly referenced as the "Cardiology III - Dual Head Stethoscope," which has the KILA EXCELLENCE concentric circles logo visible on the larger diaphragm.  Id.

36.  The October 31, 2008 version of Defendant's website also included multiple images of a stethoscope chestpiece accompanying Defendant's descriptions of the "KS-430 Single Head Stethoscope."  These images, depicted in Figures 8 and 9, closely mimic 3M's MASTER CARDIOLOGY configuration mark:





**Figure 8**                    **Figure 9**

37.  Also as of October 31, 2008, Defendant's website offered for purchase a "KS-530 Cardiology III Dual Head Stethoscope."  3M's word mark "Cardiology III" was repeated many times throughout Defendant's website as the designation for the dual-headed stethoscopes advertised for sale.  Pls. Exs. 144, 167.

38.  Additionally, as of October 31, 2008, Defendant was reselling genuine LITTMANN Identification Tags on his website.  3M contends that the image of the product, depicted in Figure 10 below, included unauthorized use of the LITTMANN word mark, the LITTMANN QUALITY Stylized L and the 3M logo.  Id.  3M further contends that other areas of Defendant's website also included incorrect and unauthorized use of the LITTMANN word mark.



**Figure 10**

39.  Voegeli testified that his October 31, 2008 cease-and-desist letter did not reference any use of the MASTER CARDIOLOGY word mark or the use of 3M's trademarks on Defendant's eBay and Amazon listings because 3M was not yet aware of these uses.

40.  Defendant responded to Voegeli via email on November 12, 2008, stating that Defendant would alter the Kila Labs logo, that he would no longer use the terms CARDIOLOGY III or MASTER CARDIOLOGY, and that all references to LITTMANN

14

trademarked products would in the future include appropriate ownership references. However, Defendant's accompanying email also stated that Defendant reserved his rights to use any 3M terms that had become generic and to "protect ourselves from predatory or restrictive demands." The email further stated that, in Defendant's opinion, LITTMANN exercised "a monopoly hold on the high end stethoscope market." Pls. Exs. 145, 145-1.

41. Voegeli responded to Defendant's November 12, 2008 email with an email dated December 24, 2008. In the email, Voegeli requested more information about the changes Defendant planned to make and expressed concern about Defendant's purported "reservation of rights." Pls. Ex. 146. After receiving no response from Defendant for several months, 3M referred the matter to outside counsel, who wrote to Defendant in an email and accompanying letter dated April 1, 2009. Pls. Ex. 147. Defendant responded via email the same day, stating that Voegeli's December 24, 2008 email had accidentally gone into Defendant's spam email box. Defendant's email further stated that he had made the changes requested in Voegeli's October 31, 2008 letter and that inappropriate mention of LITTMANN, CARDIOLOGY III, or MASTER CARDIOLOGY no longer existed on his website. Defendant also asserted that the shape of Kila's single-head stethoscope was significantly different from the MASTER CARDIOLOGY configuration mark, but represented that he would make changes to the chestpiece configuration. Finally, Defendant stated that he would remove the use of MASTER CARDIOLOGY and CARDIOLOGY III from eBay listings within 30 days, but that he was legitimately reselling LITTMANN identification tags and would continue to do so. Pls. Ex. 148.

42. Despite the representations made in Defendant's April 1, 2009 email, Defendant's eBay and Amazon listings from at least April 8, 2009 through April 15, 2009 continued to include use of the original script "K" logos depicted in Figures 4-7, the MASTER

15

CARDIOLOGY configuration mark, the MASTER CARDIOLOGY word mark, and repeated uses of the CARDIOLOGY III word mark. Pls. Exs. 149, 150, 153, 154, 155. Defendant also continued reselling genuine LITTMANN identification tags with Kila stethoscopes, including the continuing use of the "Cardiology III" word mark. See, e.g., Pls. Ex. 149. Further, Defendant sold stethoscopes under the name "Master Cardiology" together with genuine LITTMANN brand diaphragms. Pls. Ex. 452. Defendant also sold genuine LITTMANN diaphragms displaying the LITTMANN QUALITY design mark. See, e.g., Pls. Ex. 191.

43. 3M outside counsel, Attorney Jon Trembath ("Trembath") of the law firm Merchant & Gould, testified that he performed Internet searches for Defendant's products and printed unaltered screenshots of the web pages he discovered. Figure 11, below, is part of a screenshot of Defendant's eBay listings taken on April 15, 2009. Pls. Ex. 155. The KILA EXCELLENCE logo can clearly be seen on the diaphragm of the stethoscope in Figure 11. Additionally, in Figure 11, Defendant is using the CARDIOLOGY III word mark, without alteration, together with the words "Littmann ID tag."



| Picture hide | Item Title | Price | Bids | Time Left ▲ |
|---|---|---|---|---|
| | CARDIOLOGY III kila Stethoscope + Littmann ID tag | US $37.95 | 1 | 1d 18h 28m |

**Figure 11**

44. As of April 2009, Defendant was also using a somewhat-revised circular Kila logo within the banner of his website. See, infra, Figure 12. This revised logo was still circular, still

prominently featured a script letter "K," and still included the words "KILA LABS EXCELLENCE" in capital letters.  <u>Id.</u>



**Figure 12**

45.  On April 15, 2009, Trembath sent Defendant an email, stating that despite Defendant's April 1, 2009 representations to the contrary, Defendant continued to post infringing material on his website, on eBay, and on Amazon.  Trembath requested substantiation for Defendant's claims that his stethoscopes have "the best sound and look in a cardiology stethoscope" and that "our stethoscopes match the quality of the premium brand."  Pls. Ex. 151.

46.  In his responsive email on April 16, 2009, Defendant stated that any infringing marks should have been removed and that any continuing infringement was simply an "oversight."  Defendant further stated, "We have a right to make hyperbolic marketing claims. . . . Again, our scopes 'have the best sound' in the same vein that we live in the 'best country in the world.'"  Pls. Ex. 152.

47.  Defendant wrote on April 20, 2009 that, "We have remedied almost all of the alleged infringements."  Defendant stated that any remaining issues would be resolved within approximately two months.  Pls. Ex. 156.

48.  Voegeli testified that there was no other correspondence between Defendant and Plaintiffs or Plaintiffs' agents beyond that which has been described above.  However, after Defendant's April 20, 2009 email, 3M continued to monitor Defendant's online sales activities.

From at least April 29, 2009 through June 3, 2009, Defendant's website and eBay listings continued to feature the original Kila logos in Figures 4-7. Pls. Exs. 157-59. During this period, Defendant was also using a slightly different version of the Kila logos in Figures 4-7. This revised version still featured the letter "K" – but with a slightly altered script font. See, infra, Figures 13-15; Pls. Exs. 159, 167. Defendant's website also used the designation "Cardiology III" for his dual-headed stethoscopes at least as late as May 15, 2009. Pls. Ex. 158.







**Figure 13**        **Figure 14**        **Figure 15**

49. Beginning as early as April 29, 2009, Defendant sold stethoscopes under names derived from the word CARDIOLOGY and a number designated by an Arabic numeral. For example, Defendant sold stethoscopes styled as "Cardiology 3," "Cardiology 5," "Cardiology Class 5," and "Cardiology 7." See, e.g., Pls. Exs. 157, 163, 164.

50. Then, in June 2009, 3M discovered that Defendant was using a new trade name: Lautenn. Pls. Ex. 160. Defendant's stethoscopes and eBay listings now displayed a new logo with a script letter "L" contained within two concentric circles. Pls. Exs. 160, 167. The words LAUTENN EXCELLENCE were written within the outer ring formed by the two concentric circles, as depicted in Figures 16-18, below. Id.

18




**Figure 16**          **Figure 17**          **Figure 18**

51.  On or about January 2010, Defendant began selling "rebuild kits" utilizing an eBay listing title "REBUILDKit Littmann® Cardiology III® Stethoscope ORNG."  Pls. Ex. 246.  The kit contained replacement ear tips, a diaphragm featuring yet another Kila logo, and orange stethoscope tubing connected to attached ear tips.  Pls. Ex. 421.  Defendant had earlier written in an April 22, 2009 email to Trembath, "In our opinion we have the right to bundle our products with Littmann accessories and adapters.  It may be unsavory, but is a tried and tested marketing gimmick to draw traffic.  However, we see no dilution or tarnishing of littmann's trade marks or copyrights."  Pls. Ex. 410.

### 2.  Internet Search Engine Optimization

52.  To optimize the number of individuals who visit a particular website, strategies of "search engine optimization" are used to increase the website's rank on search engines like Google and eBay.  The "higher" a website appears within a list of search results, the more likely it is visitors will land at that website via a particular search engine.  One of the strategies used to increase rank is to include often-searched terms in the "listing title" of an eBay listing or the "title tag" of a Google ad.  Pls. Ex. 175.

53.  Plaintiffs' witness John Grudnowski ("Grudnowski"), the founder and managing partner of digital marketing company FRWD Co., testified that 3M's trademarks LITTMANN and 3M are often used as keywords for online searches.  Grudnowski also testified that the term "Kila" has a very low search volume in comparison to 3M's trademark terms.

54.  Defendant purposefully included 3M's trademarks in his listing titles on eBay.  <u>See</u> Pls. Ex. 194.

55.  Defendant's marketing and promotional activity, especially through eBay, leveraged 3M's trademarks, including the word marks CARDIOLOGY III and MASTER CARDIOLOGY, to gain rank and drive online customers to buy stethoscopes from Defendant.  Defendant's business records establish that he frequently used eBay listing titles similar to the following: "Cardiology III kila Stethoscope + Littmann ID tag;" "MASTER CARDIOLOGY kila-0 Stethoscope + Littmann ID tag;" "Kila brand CARDIO7 Stethoscope *FREE Litmann (sic) (tm) IdTag;" and "GRAY kila Cardio-5 QUALITY Stethoscope + LITTMANN IdTag."  <u>See</u>, <u>e.g.</u>, Pls. Exs. 194, 197.   Defendant also resold large quantities of genuine LITTMANN identification tags using eBay listing titles similar to "3M Littmann Black ID NAME TAG fits most Stethoscopes."  <u>Id.</u>  Additionally, he sold genuine LITTMANN diaphragms, binaurals, ear tips and other stethoscope accessories using listing titles featuring the term "Littmann."  <u>Id.</u>  The inclusion of 3M's trademark terms increases the likelihood Defendant's listing or website would appear high within Google, eBay, or other search engine results for a searcher using the search keywords "littmann" or "cardiology iii" or "master cardiology."  Pls. Ex. 175.   At least one search on eBay using the search keywords "littmann" and "stethoscope" revealed Defendant's listing for "NEW - kila CARDIOLOGY 7 CLASS Stethoscope + Littmann Tag" appearing as the highest-ranked result – higher than listings for genuine LITTMANN stethoscopes.  Pls. Ex. 198.

56. Defendant also used 3M's trademarks as keywords within his Google AdWords advertising account. Pls. Exs. 199, 201. Additionally, Defendant demonstrated his knowledge of eBay search engine optimization techniques by including terms known to increase rank on eBay. These terms include "special" and "free shipping." <u>See</u>, <u>e.g.</u>, Pls. Ex. 194.

## D. Quality of Defendant's Stethoscopes

### 1. Customer Feedback

57. Some of Defendant's customers expressed concerns with the quality of Defendant's stethoscopes. One of Defendant's customers wrote in a January 13, 2008 email, "The sound is great, the design is great, just the manufacturing was a bit unrefined, like the earpieces have jagged edges and the plastic around the diaphram (sic) and bell is not smooth and has a small chip. It would be more comparable to a Littmann if the workmanship was not so messy. Otherwise I am very satisfied with your product..." Pls. Ex. 337. Similarly, a customer wrote in a June 2, 2008 email, "...it seems like a decent item but I compared (sic) with a Littmann and their sound production is definitely superior. It's worth it to me to spend more to make diagnosis easier." Pls. Ex. 345.

58. Another customer wrote in a February 25, 2008 email, "Received the stethoscope on Saturday. I'm not sure what is wrong with it though the head keeps spinning around and coming off." Pls. Ex. 339.

59. A customer wrote in a March 18, 2008 email, "the item sent was in good condition but was not of good quality. It is useless to me because it's very hard to listen to heart sounds and lung sounds." Pls. Ex. 340.

60. Another customer wrote in a June 3, 2008 email, "I am a paramedic and used the scope on my shift last night. The head of the scope fell off TWICE. I'm sure you understand the

fast paced nature of what we do so this was not acceptable. The earpieces don't seal as well as they should. And I can't hear as well out of this scope as my low-end littman (sic). It is obvious that the quality of workmanship is not as represented." Pls. Ex. 346.

61. A customer wrote in an August 11, 2008 email, "I dont (sic) think this stethoscope compares to a littmann or other top brand names, as advertised. The ridges on the head to hold the tube on are almost gone and appear to have cracked off or something." Pls. Ex. 358.

62. A customer wrote to Defendant on December 26, 2008, asking for a refund and stating "I recently bought a stethescope (sic) from your company off e-bay and upon receiving it realized there is absolutely no comparison to littman (sic)." Pls. Ex. 333.

### 2. Testimony on Physical Quality

63. Mary Jo Johnson ("Johnson"), a 3M Infection Prevention Division Product Development Specialist, testified she conducted a physical evaluation of four of Defendant's stethoscopes. She conducted the evaluation according to the standard evaluation method 3M has developed for testing defective LITTMANN stethoscopes. Johnson is a member of a product team that evaluates LITTMANN customer complaints. If a customer complains, 3M asks the customer to send in the stethoscope for evaluation. The allegedly defective stethoscope is then evaluated using the standard physical evaluation method.

64. 3M ordered four of Defendant's Kila stethoscopes offered for sale over the Internet. Pls. Ex. 452. Johnson testified her evaluation revealed that all four of Defendant's stethoscopes were physically inferior to LITTMANN stethoscopes. Pls. Exs. 161, 162, 163, 164. Johnson testified that 3M has detailed specifications for every single component of the LITTMANN stethoscopes. Her testimony was that the four Kila stethoscopes "wouldn't pass muster at 3M." The ear tips were made of inferior plastic and plastic coating and the tubing was less flexible than

LITTMANN tubing and would not entirely uncurl. She further testified that pieces of Defendant's stethoscopes came off too easily, including the ear tips, diaphragms and chestpieces. In particular, the metal of the headset underneath the ear tips was sharp and jagged, and that an end user could have unknowingly shoved the jagged metal into his or her ear canal.

65. Johnson also testified that the way the Kila components fit together was sloppy and inferior compared to LITTMANN products. For example, one diaphragm seemed too big and did not fit perfectly on the chestpiece. This mismatch could negatively affect the stethoscope's acoustic properties. Additionally, Johnson testified that one chestpiece was rusty, that the diaphragm plastic was cheap, that the tubing was flatter and bumpier than LITTMANN specifications, and that one of the stethoscopes had a small cut in the tubing. Overall, she testified, the four Kila stethoscopes did not meet LITTMANN physical quality specifications.

### 3. Testimony on Acoustical Quality Comparison

66. Daniel Rogers ("Rogers"), a 3M Infection Prevention Division Project Development Specialist, conducted acoustic performance tests on the four stethoscopes Johnson examined. Pls. Exs. 161, 162, 163, 164, 200. Rogers, like Johnson, testified that he used a standard performance testing methodology previously developed by 3M. Rogers used a Brüel and Kjær Head and Torso simulator to test Defendant's stethoscopes' acoustic performance against the performance of comparable LITTMANN stethoscopes. Pls. Exs. 219-1, 220. Rogers' test results were that the acoustical performance of Defendant's stethoscopes was inferior not only to the LITTMANN MASTER CARDIOLOGY and CARDIOLOGY III stethoscopes, but also to the entire line of LITTMANN adult acoustic stethoscopes. Pls. Ex. 220.

67. Craig Oster ("Oster"), 3M Infection Prevention Division Technical Manager of Electro-Mechanical Systems, supervised Rogers' testing. Pls. Ex. 222. Oster testified that

Defendant's stethoscopes are only one-half to one-fourth as loud as a LITTMANN stethoscope at the lower frequencies (approximately 20 to 75 Hertz), the range of clinically significant heart sounds. Pls. Ex. 226. Normal, healthy heart sounds – as well as the sounds indicative of heart pathologies – occur at these low frequencies, making acoustical clarity especially important at these frequencies. Pls. Ex. 222. Oster testified that Defendant's stethoscopes create a risk for medical professionals who rely on Defendant's stethoscopes, believing they possess the same sound quality as LITTMANN stethoscopes. Inferior acoustics could cause a patient's health condition to be misdiagnosed or to remain undiagnosed. Id.

**E. Likelihood of Confusion**

**1. Evidence of Actual Confusion**

68. Emails sent by purchasers of Defendant's stethoscopes show some of them confused Defendant's stethoscopes with genuine LITTMANN products. One customer, who apparently purchased a stethoscope from Defendant on eBay, wrote in a December 26, 2008 email: "Hi I am sorry I was comfussed (sic) about this item, as when I bid I thought I was biddin (sic) on a Littmann brand as is im (sic) the title. I am not interested in this item if its not a Littmann, sorry I didnt (sic) read more carefully." Pls. Ex. 332. Defendant responded the same day, canceling the customer's bid and stating, in part, "Sorry for the confusion . . . ." Id.

69. Another customer emailed Defendant asking for a refund on January 5, 2009. The customer stated, "I just received the orange stethoscope and it is not what I thought it was. I thought it was a Littmann Cardiology stethescope (sic) and its (sic) not." The same customer also responded to an email from Defendant apologizing for the misunderstanding, writing, "I think it was the phrase Littmann that threw me off. I am returning it today." Pls. Ex. 334.

70. Another customer emailed Defendant on January 13, 2009 asking for Defendant to cancel an eBay bid, stating, "I'm sorry, I thought that I was bidding on a littman (sic) ... can I cancel?" Pls. Ex. 335.

## 2. Likelihood of Confusion Survey

71. 3M retained Hal Poret ("Poret"), Senior Vice President of InfoGroup, to design and implement a survey to measure the likelihood of consumer confusion between Defendant's stethoscopes and LITTMANN stethoscopes. Poret holds a bachelors degree in mathematics, a masters degree in mathematics, and a J.D. from Harvard Law School. Poret has designed, supervised, and implemented nearly 300 consumer surveys. Over 150 of his surveys were directed at the issue of consumer confusion created by trademarks and advertising. Poret's surveys have been received in several United States District Courts. Pls. Ex. 206.

72. The Poret survey here was an online survey administered in a double-blind fashion from February 24, 2010 through March 9, 2010. A web survey programming company programmed and hosted the online survey, and a company with expertise in developing and maintaining representative panels of health care professionals recruited the pool of survey respondents. Neither company knew the purpose of the survey or the survey's sponsor. Similarly, the survey respondents were not told about the purpose of the survey or the identity of the survey's sponsor. Id.

73. Poret defined the relevant universe for the survey as prospective purchasers of the stethoscopes Defendant advertised for sale on eBay. Respondents had to possess the following five characteristics: 1) be a physician or a nurse; 2) use a stethoscope as part of their practice; 3) personally make the decision about what stethoscope to purchase for their personal use; 4) have previously purchased a stethoscope on the Internet or be open to purchasing their next

stethoscope over the Internet; and 5) be open to purchasing a stethoscope through eBay.  Id.

74.  A total of 400 physicians and nurses participated in the online survey.  Poret testified that online surveys are the most common method of conducting market research among health care professionals.  Physicians completed 200 of the online surveys, and nurses completed 200 of the online surveys.  Additionally, Poret created quotas for the pool of physicians and nurses that roughly approximated the nationwide medical specialty distribution (e.g., internal medicine vs. pediatrics vs. cardiology, and registered nurses vs. nurse practitioners).  Participants were each paid a $25 honorarium for participating in the survey.  Id.  The company that provided the panel of respondents verified respondents' identities by collecting identifying information such as work and home addresses.

75.  Poret divided the 400-person survey group into four separate "cells" of 100 respondents per cell.  Each cell contained 50 physicians and 50 nurses.  Three cells were test groups, and the remaining cell was a control group.  The respondents in Cells 1, 2, and 3 were shown and asked about one of Defendant's eBay listings.  Id.  Each listing contained a photograph of the stethoscope for sale, as well as descriptions, specifications, and other information provided by Defendant – including a comparison chart with photographs of Defendant's stethoscopes.  Pls. Exs. 206, 214-216.



**Figure 19**

76. Cell 1 respondents were shown and asked about Defendant's eBay advertisement for a "GRAY kila Cardiology III Stethoscope + Littmann ID tag." This advertisement displayed the 3M marks in connection with a stethoscope diaphragm bearing the "K" logo depicted in Figure 7. The starting bid price shown was $39.95. Pls. Exs. 206, 211.

77. Cell 2 respondents were shown an eBay advertisement for a "MASTER CARDIOLOGY kila-9 Stethoscope + Littmann ID tag." The advertisement displayed a stethoscope chestpiece that closely mimics the MASTER CARDIOLOGY configuration mark. The starting bid price shown was $42.95. Pls. Exs. 206, 212; see, supra, Figure 19.[3]

78. Cell 3 respondents were shown Defendant's eBay advertisement for a "CARDIOLOGY Class-5 Performance Dual Head Stethoscope." The stethoscope shown had the

_____

[3] The Court does not have access to a digital image of the advertisements shown to Cells 1, 3, or 4.

LAUTENN EXCELLENCE logo displayed on its diaphragm.  See, supra, Figure 18.  The starting bid price was $34.95.  Pls. Exs. 206, 213.

79.  Cell 1, 2 and 3 respondents were asked a number of screening questions, and were then shown an eBay web page.  The web page displayed was a complete and accurate copy of Defendant's actual eBay listing as it would have appeared to a customer on the Internet, with the sole exception that the ads were digitally altered to remove the end date of the eBay auction.  The text accompanying the question stated:

> Here is the web page. Please take as much time as you need to review the stethoscope and web page as you would if you were considering whether or not to purchase it. When you have finished examining it, you can click next to continue. The web page will then disappear from the screen and you will be asked some questions. If you can't view the image of the web page clearly, please indicate so below.

Pls. Exs. 206, 210, 445.  After the web page disappeared from the screen, the respondents were asked to answer a series of questions.  These questions are part of a series of approximately ten questions known as the "Eveready" survey.  This type of survey is designed to determine if any of several types of confusion recognized in the Lanham Act are present.  Pls. Ex. 206.

80.  The first three questions asked the respondents to state their opinion as to what company or brand makes the stethoscope they saw in the advertisement and what makes them believe the stethoscope is from that particular company or brand.  Pls. Exs. 206, 210, 445.

81.  Respondents were next asked a few questions designed to determine whether respondents believed the advertised stethoscope (even if not a LITTMANN) was made by the same company that makes LITTMANN stethoscopes.  These questions were about whether the respondents believed other brands were made by the company that manufactured the stethoscope in the advertisement and what makes the respondents think that the company who makes the

stethoscope advertised also makes these other brands.  Id.

82.  The final questions were designed to determine whether respondents believed the advertised stethoscope (even if not a LITTMANN) was sponsored, approved, or authorized by LITTMANN.   The respondents were directly asked whether the advertised stethoscope was being sold with the sponsorship, approval, or authorization of any particular company or brand.  Respondents were also asked what about the advertisement helped them form that opinion.  Id.

83.  Cell 4 respondents were asked the same questions as those described above and administered to Cells 1, 2 and 3.  However, to ensure that respondents were not simply guessing LITTMANN or 3M because they are well-known brands, the advertisement in Cell 4 was altered to remove all traces of LITTMANN or 3M marks.  Thus, Cell 4 was designed to measure "survey noise," or the tendency of respondents to name LITTMANN or 3M in connection with a stethoscope for reasons other than marks or words included within the eBay advertisement.  Pls. Ex. 206, 217.

84.  The Cell 4 survey noise measurement results were that 10% of respondents answered that the stethoscope shown in the control advertisement was made or sponsored by LITTMANN or 3M.  The noise level inherent in the survey was thus 10%, meaning that 10% of respondents named LITTMANN or 3M even when shown a stethoscope advertisement that does not include marks similar to 3M's marks.  Pls. Ex. 206.

85.  The overall confusion as measured by the Poret survey is determined by subtracting the amount of survey noise measured by control Cell 4 from the level of confusion measured by test Cells 1, 2, and 3.  The results of the test cells showed that a significant number of respondents believed LITTMANN or 3M was associated with Defendant's stethoscope advertisements.  In Cell 1, 40% of respondents mistakenly believed the stethoscope was a LITTMANN or was made

or sponsored by LITTMANN or 3M.  In both Cell 2 and Cell 3, 52% of respondents mistakenly believed the stethoscope was a LITTMANN or was made, sponsored, approved or authorized by LITTMANN or 3M.  Id.

86.  Thus, the net confusion level for Cell 1 was 30% (40% minus 10%), and the net confusion level for Cells 2 and 3 was 42% (52% minus 10%).  Poret opined that net confusion levels of 30% and 42% far exceed the threshold researchers and courts use to determine whether there is a likelihood of confusion for purposes of the Lanham Act.  He testified that, in his opinion to a high degree of professional certainty, Defendant's eBay ads tested in the survey were likely to have caused and are likely to cause high levels of confusion.  Id.

87.  The Poret survey also captured the verbatim responses from respondents who stated they believed the stethoscope advertised was a LITTMANN or was made by the company that makes LITTMANN.  The verbatim responses to questions about why respondents in Cells 1, 2, and 3 formed the opinion that the advertised stethoscope was a LITTMANN or made by the same company are listed below.  They have not been edited for spelling or grammar:

**Cell 1**
It stated the Littman name.

The description of the product, the look of the product.

The name in the description.  The Ad picture and description.

I read Cardiology III, which in the past has been associated with Littman.

Has "littman" id tag, similar in appearance, said litman in ad.

**Cell 2**
Name of the stethoscope listed.  Symbol for Littman was used.

The style mostly.  Only Littman makes their stethescope that shape.

30

It said that in writing and I recognized the look of them because I have owned one in the past.

I read the description of the stethascope and it clearly stated that it is a KILA+LITTMAN stethascope. I am also familiar with the look of Littman stethascopes.

It states that it is a Kila stethoscope with Littman tag.

It seems clear enough that Kila would not use the Littman name unless they had approval from Littman.

**Cell 3**
The cursive L on the diaphragm . . . Also the style of the cardiology single head diaphragm model is very distinctive.

The letter L on the diaphragm, the model name Cardiology.

There was a big Littaman L on the diaphragm.

The picture appeared to have Littman logo on bell.

I have 2 Littmans that look just like the ones in those pictures. They have a characteristic look, especially the cardiology one. They are different than the sprague-rappaport style stethoscope.

The L on the diaphragm and the unique style of the cardiology single head design with its finger groove.

Pls. Exs. 214-16.

88. Defendant contends that his 100% "positive rating" on eBay shows that his customers were satisfied and therefore not confused. Poret testified that the eBay positive rating is largely irrelevant to the question of confusion, as a customer may rate Defendant based on a variety of factors, including shipping speed and customer service. Additionally, Poret testified that if a customer mistakenly confused Defendant's product with a LITTMANN stethoscope, it is likely that the customer will continue believing the product was a LITTMANN and therefore not complain to Defendant about confusion. Moreover, the emails excerpted above show that at least

some customers actually did confuse Defendant's stethoscopes with LITTMANN stethoscopes.

## III.  CONCLUSIONS OF LAW

### A.  Jurisdiction

89.  Plaintiffs assert claims of trademark infringement under the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125.  Plaintiffs claim that Defendant infringed 3M's MASTER CARDIOLOGY word mark and 3M's CARDIOLOGY III word mark.  Plaintiffs also assert Minnesota state law claims under the Minnesota Unlawful Trade Practices Act, Minn. Stat. §325D.09, and the Minnesota Deceptive Trade Practices Act, Minn. Stat. §§ 325D.43-.48.  Finally, Plaintiffs assert a common law unfair competition claim.

90.  The Court has jurisdiction over the Lanham Act claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1338.  The Court has supplemental jurisdiction over the state-law and common-law claims pursuant to 28 U.S.C. § 1367.   The Court does not independently analyze Plaintiffs' state law claims or Plaintiffs' common law claim because the three claims are coextensive with the Lanham Act claims.  DaimlerChrysler AG v. Bloom, 315 F.3d 932, 935 n.3 (8th Cir. 2003).

### B.  Trademark Infringement

#### 1.  Legal Standard

91.  A plaintiff asserting trademark infringement has the burden to prove by a preponderance of the evidence that: 1) the plaintiff owns a valid, protectable mark; and 2) a likelihood of confusion exists between the plaintiff's mark and the defendant's mark.  B&B Hardware, Inc. v. Hargis Indus., Inc., 569 F.3d 383, 389 (8th Cir. 2009); Champagne Louis Roederer v. J. Garcia Carrion, et al., No. 06-213, 2010 WL 3200034, *20 (D. Minn. Aug. 10, 2010).  This Court previously determined that 3M's MASTER CARDIOLOGY and CARDIOLOGY III trademarks are suggestive marks that are valid and protectable [Docket No.

151 at 13-15]. Thus, the only remaining issue is whether a likelihood of confusion exists between 3M's marks and Defendant's marks.

### 2. Likelihood of Confusion

92. Plaintiffs assert a likelihood of confusion as to association, endorsement, or sponsorship between the LITTMANN MASTER CARDIOLOGY and CARDIOLOGY III marks and Defendant's marks. Likelihood of confusion is a question of fact. SquirtCo v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir.1980). The Lanham Act provides that infringement is proven when a plaintiff shows evidence of:

> . . . . any word, term, name, symbol or device, or any combination thereof, . . . which is *likely to cause confusion*, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities[.]

15 U.S.C. § 1125(a) (emphasis added); see also 15 U.S.C. § 1114.

93. Courts, in determining whether a likelihood of confusion exists, consider the following SquirtCo factors: 1) the strength of the trademark; 2) the similarity between the plaintiff's and defendant's marks; 3) the competitive proximity of the parties' products; 4) the alleged infringer's intent to confuse the public; 5) evidence of any actual confusion; and 6) the degree of care reasonably expected of the plaintiff's potential customers. B&B Hardware, 569 F.3d at 389; SquirtCo, 628 F.2d at 1091. The factors serve as a guide; no single factor is dispositive. Gateway Inc. v. Companion Prods., Inc., 384 F.3d 503, 509 (8th Cir. 2004). Likelihood of confusion "is not to be mechanically determined through a rigid application of the factors . . . because the inquiry is inherently case-specific, different factors may be entitled to more weight in different cases." Kemp v. Bumble Bee Seafoods, Inc., 398 F.3d 1049, 1054 (8th

Cir. 2005); see also First Nat'l Bank v. First Nat'l Bank, 655 F. Supp. 2d 979, 994 (D. Minn. 2009).

94.   Although likelihood of confusion must be "among an appreciable number of consumers," actionable confusion may exist where fewer than majority of consumers are confused.   Gateway, 384 F.3d at 509; Mut. of Omaha Insur. Co. v. Novak, 836 F.2d 397, 400 (8th Cir. 1987) (finding of actual confusion upheld when survey evidence showed 10 % confusion).

### i. Strength of 3M's trademarks

95.   A mark's strength consists of both its degree of conceptual distinctiveness and its commercial strength in the marketplace.   Mars Musical Adventures, Inc. v. Mars, Inc., 159 F. Supp. 2d 1146, 1150 (D. Minn. 2001); see Roederer, 2010 WL 3200034 at *22; see also 2 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition, § 11:83 (4th ed. 2009) [hereinafter "McCarthy"].

96.   Conceptual distinctiveness is determined by a mark's classification as either:  1) generic; 2) descriptive; 3) suggestive; or 4), arbitrary or fanciful.   Mars, 159 F. Supp. 2d at 1150; Roederer, 2010 WL 3200034 at *22.   Suggestive marks are highly distinct, although less distinct than arbitrary or fanciful marks.   Roederer, 2010 WL 3200034 at *24.   3M's CARDIOLOGY III and MASTER CARDIOLOGY marks are suggestive [Docket No. 151], and therefore possess a high degree of conceptual distinctiveness.   Id.

97.   A mark's commercial strength is determined by examining the public recognition and renown of the mark among "the class of customers and potential customers of a product or service" as evidenced by the extent of advertising, marketplace recognition, sales volume, features and reviews in publications, and survey evidence.   Roederer, 2010 WL 3200034 at *24

(quoting <u>Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772</u>, 396 F.3d 1369, 1374-76 (Fed. Cir. 2005)); <u>see also</u> <u>Insty*Bit, Inc. v. Poly-Tech Indus., Inc.</u>, 95 F.3d 663, 670 (8th Cir. 1996).

98.  The MASTER CARDIOLOGY and CARDIOLOGY III  marks are commercially strong.  LITTMANN MASTER CARDIOLOGY stethoscopes have been on the market for over 20 years, and LITTMANN CARDIOLOGY III stethoscopes have been on the market for more than a decade.  A 2006 survey of LITTMANN stethoscope owners found that 80% most often use either a MASTER CARDIOLOGY or a CARDIOLOGY III stethoscope.   In 2009 alone, 3M sold tens of thousands of MASTER CARDIOLOGY and CARDIOLOGY III stethoscopes.  In both 2008 and 2009, 3M sold over 35,000 MASTER CARDIOLOGY stethoscopes, with sales of over $5 million each year.  In those same years, 3M sold over 100,000 CARDIOLOGY III stethoscopes, with sales of over $11 million.  Pls. Ex. 34.

99. The MASTER CARDIOLOGY and CARDIOLOGY III marks are registered separately from the LITTMANN word mark, but in practice the marks are almost always shown together.  MASTER CARDIOLOGY and CARDIOLOGY III stethoscopes, as LITTMANN sub-brands, are most often designated as "LITTMANN MASTER CARDIOLOGY" and "LITTMANN CARDIOLOGY III."  <u>See</u>, <u>e.g.</u>, Pls. Exs. 13, 14-1, 14-2, 16, 26, 26-1, 27, 29, 37, 38, 39, 40, 41, 43, 44, 45, 48, 51, 52, 57, 142.  Therefore, some weight should be accorded the considerable fame of the LITTMANN brand in general.  The LITTMANN brand has a 70% share of the stethoscope market, survey evidence shows 96% of medical professionals in the United States are familiar with the LITTMANN brand, and 3M annually sells over half a million LITTMANN stethoscopes.  Furthermore, LITTMANN stethoscopes are frequently seen in popular television shows and movies, and in 2009 LITTMANN stethoscopes were featured in

multiple media outlets. Finally, Plaintiffs established at trial that the terms "Littmann" and "3M" are popular Internet search terms. The general fame and renown of the LITTMANN brand, which is inextricably intertwined with both the MASTER CARDIOLOGY mark and the CARDIOLOGY III mark, clearly adds to the strength of both marks.

100. The MASTER CARDIOLOGY and CARDIOLOGY III marks are commercially strong and possess a high degree of conceptual distinctiveness. Therefore, the marks are considered "strong" for purposes of the SquirtCo analysis. Roederer, 2010 WL 3200034 at *24. The first factor, the strength of 3M's marks, weighs decidedly in favor of likelihood of confusion.

### ii. Similarity of the marks

101. Similarity of marks supports a finding of likelihood of confusion. SquirtCo, 628 F.3d at 1091. In evaluating the similarity of the marks, courts consider the overall impression created by the marks, including their trade dress and visual, aural, and definitional attributes, to determine whether "the total effect conveyed by the two marks is confusingly similar." Luigino's, Inc. v. Stouffer Corp., 170 F.3d 827, 830 (8th Cir. 1999); Duluth News-Tribune v. Mesabi Publ'g Co., 84 F.3d 1093, 1097 (8th Cir. 1996). Courts should evaluate the marks as a purchaser would encounter them in the marketplace – not side-by-side or by comparing the marks' individual features. Gen. Mills v. Kellogg Co., 824 F.2d 622, 627 (8th Cir. 1987); Luigino's, 170 F.3d at 830; Roederer, 2010 WL 3200034 at *28.

### a. Defendant Used Counterfeit Marks

102. Defendant used the MASTER CARDIOLOGY and CARDIOLOGY III word marks – without alteration – to identify non-LITTMANN stethoscopes for sale on his website, on eBay, and on Amazon. The marks, as used by Defendant, are completely identical in sight and sound to 3M's marks. Defendant's unaltered use of the MASTER CARDIOLOGY and CARDIOLOGY

36

III marks result in an overall impression that is confusingly similar to 3M's marks and constitutes counterfeiting. Counterfeit marks are spurious designations, identical to or substantially indistinguishable from another's registered trademark. 15 U.S.C. §§ 1116(d), 1127. Defendant's use of MASTER CARDIOLOGY and CARDIOLOGY III as designations for stethoscopes that were not genuine LITTMANN MASTER CARDIOLOGY or LITTMANN CARDIOLOGY III stethoscopes is a spurious designation.

103. Additionally, the chestpiece on Defendant's single-head stethoscope is substantially indistinguishable from 3M's MASTER CARDIOLOGY configuration mark. <u>See</u>, <u>infra</u>, Figure 20 (genuine LITTMANN MASTER CARDIOLOGY chestpiece); <u>compare</u>, <u>infra</u>, Figure 21 (Defendant's single-sided stethoscope). Defendant's use of this chestpiece configuration also constitutes counterfeiting under the Lanham Act.





**Figure 20**                    **Figure 21**

*b. **Defendant used counterfeit marks together with other marks similar to LITTMANN marks***

104. Defendant also displayed the counterfeit marks together with marks similar to the LITTMANN marks that are displayed in conjunction with 3M's MASTER CARDIOLOGY and CARDIOLOGY III marks. This practice enhanced the commercial impression that Defendant's stethoscopes were associated with LITTMANN. For example, Defendant used the Kila Labs

Excellence and Kila Excellence concentric circle logos (Figures 4-7, 13-15) in conjunction with counterfeit MASTER CARDIOLOGY, CARDIOLOGY III, and MASTER CARDIOLOGY configuration marks. Defendant's Kila logos consist of a script letter "K" surrounded by two concentric circles and capital-letter text stating "KILA LABS EXCELLENCE" or "KILA EXCELLENCE." The circular Kila marks and the circular LITTMANN marks both use a large script letter within two concentric circles. Additionally, both the Kila marks and the LITTMANN QUALITY Stylized L mark use capital-letter text within their concentric circles. The text itself is also similar because the term "quality" conveys a meaning in this context very much like "excellence." Thus, the Kila marks create the same overall impression as the LITTMANN QUALITY Stylized L and Stylized L design marks. See, <u>infra</u>, Figures 4-7, 13-15; <u>compare</u> Figures 1-2. This similarity becomes obvious when the Kila marks are seen from a distance and/or in isolation from the LITTMANN marks.



**Figure 22**[4]

---

[4]The original Kila concentric circle logos (Figures 4, 6), a revised Kila logo (Figure 14), the circular LITTMANN marks (Figures 1, 2), and the LAUTENN EXCELLENCE mark (Figure 18) are displayed together in Figure 22 for ease of visual comparison.

105. Defendant also bundled his stethoscopes with genuine LITTMANN replacement parts, such as identification tags and replacement diaphragms. For example, Defendant sold stethoscopes designated MASTER CARDIOLOGY along with genuine LITTMANN replacement diaphragms. Pls. Ex. 452. Defendant also re-sold large volumes of LITTMANN replacement parts individually, which further associated his business with LITTMANN. Pls. Ex. 194.

### c. Defendant used marks similar to 3M's marks

106. Months after receiving Plaintiffs' first cease-and-desist letter, Defendant began using the business name "Lautenn" and the "LAUTENN EXCELLENCE" logo. See, supra, Figures 15, 22. Defendant's switch from Kila to Lautenn was an overt move that intensified the similarity with the 3M LITTMANN marks. First, the name "Lautenn" and the name "Littmann" both begin with the letter "L," end with two "N's" and have at least one "T" separating syllables. The names are therefore both visually and aurally similar. Additionally, the LAUTENN EXCELLENCE logo (Figure 18), featuring a script letter "L" surrounded by two concentric circles and the capital-letter text "LAUTENN EXCELLENCE" creates an extremely similar impression to the "LITTMANN QUALITY" trademark, especially when seen in isolation and at a distance. See, supra, Figure 22. Once again, the term "quality" is contextually similar with "excellence."

107. After being notified of 3M's trademark rights, Defendant developed the CARDIOLOGY 3, CARDIOLOGY 5, CARDIOLOGY 7, and CARDIO 7 marks (collectively, the "Cardiology marks"). The Cardiology marks have a root word that is identical or similar to "CARDIOLOGY" followed by a numeral. The likely confusion from the use of the same root word is enhanced when the trademarks, as here, are not typically presented to the consumer side-by-side. Roederer, 2010 WL 3200034 at *28. Although Defendant's Cardiology marks use Arabic numerals instead of Roman numerals, the similarity remains. Moreover, the

"CARDIOLOGY 3" mark is aurally identical to 3M's CARDIOLOGY III mark. Thus, the Cardiology marks are confusingly similar to 3M's CARDIOLOGY III mark. Also, these marks were often used in conjunction with the LITTMANN word mark, again enhancing the impression of association with the LITTMANN brand.

108. The Defendant 1) used counterfeit MASTER CARDIOLOGY, CARDIOLOGY III, and MASTER CARDIOLOGY configuration marks; 2) used these counterfeit marks in conjunction with other marks that are confusingly similar to other well-known LITTMANN marks; and 3) created additional marks similar to 3M's marks despite 3M's multiple requests to cease and desist. Thus, the "similarity of marks" factor also weighs heavily in favor of likelihood of confusion.

### iii. *Competitive proximity*

109. The third factor considers whether 3M's products and Defendant's products are in competitive proximity. Products are in competitive proximity when there is similarity or overlap in their sales outlets, trade channels, and customers. Roederer, 2010 WL 3200034 at *26 (citing Xtreme Lashes, LLC v. Xtended Beauty, Inc., 576 F.3d 221, 234 (5th Cir. 2009)); J & B Wholesale Distrib., Inc. v. Redux Beverages, LLC, 621 F. Supp. 2d 678, 685-86 (D. Minn. 2007). This factor favors a finding of likelihood of confusion when it is reasonable for consumers to believe the products came from the same source or are somehow affiliated. Kemp, 398 F.3d at 1056; Roederer, 2010 WL 3200034 at *26; J & B Wholesale Distrib., 621 F. Supp. 2d at 686; McCarthy, supra, § 24:52 ("Even if the goods are vastly differently priced and are clearly not in competition, this does not mean that low-priced buyers have not at least heard of the expensive goods and may think that an expensive seller has expanded into a low-priced field.").

110.  Here, both 3M and Defendant sell stethoscopes online to medical professionals.  3M sells approximately 50% of LITTMANN stethoscopes online, which accounts for approximately 250,000 stethoscopes per year.  Defendant uses the Internet as his sole channel of trade.  In addition, 3M sells high-quality stethoscopes, and Defendant's advertising states that his stethoscopes "match the quality of the leading brand."  See, e.g., Pls. Ex. 192.  Therefore, the parties' customers and channels of trade overlap.

111.  3M's sales strategy for LITTMANN stethoscopes further increases the competitive proximity with Defendant.  3M sells large volumes of their stethoscopes through a variety of independent direct dealers.  See Pls. Ex. 86.  Thus, customers seeking genuine LITTMANN stethoscopes on the Internet often find and purchase LITTMANN stethoscopes from sellers that, from an outside consumer perspective, might seem to bear no significant relationship to LITTMANN.  Adding to the confusion, these direct dealers most often sell MASTER CARDIOLOGY, CARDIOLOGY III and other LITTMANN stethoscopes at prices far below the list price on 3M's web site.  Consumers may be accustomed to the use of 3M's trademarks in connection with genuine LITTMANN stethoscopes offered at a range of prices from a range of independent dealer websites.  Although Defendant's website appears to be somewhat independent of LITTMANN, this does not alleviate the confusion.  Similarly, the less expensive cost of Defendant's stethoscopes as compared to genuine MASTER CARDIOLOGY and CARDIOLOGY III stethoscopes (i.e., approximately $40 vs. $200-$250)[5] does not alleviate the confusion.  The competitive proximity factor weighs in favor of likelihood of confusion.

_____

[5] Also, the price differential is largely irrelevant to the competitive proximity analysis because likelihood of confusion, not direct competition, is the test of trademark infringement.  Mut. of Omaha, 836 F.2d at 399; McCarthy, supra, § 24:13.

### iv. Intent

112.  Although not an element of a claim for trademark infringement, intent on the part of the alleged infringer to pass off its goods as the product of another creates an inference of likelihood of confusion.  SquirtCo, 628 F.2d at 1091.  The intent factor is relevant because it demonstrates the junior user's true opinion concerning whether confusion is likely.  Kemp, 398 F.3d at 1057.  Where intent to confuse is present, it creates a powerful inference that confusion is likely to occur.  Id.

113.  The evidence at trial clearly demonstrated Defendant intended consumers to associate his stethoscopes with LITTMANN.  To take advantage of the considerable fame of the LITTMANN trademarks, Defendant caused "consumers to mistakenly believe there is, at a minimum, an association between" Defendant's stethoscopes and the LITTMANN brand.  Id. at 1057-58. Defendant – even after being advised of 3M's trademark rights: 1) designated his stethoscopes "MASTER CARDIOLOGY" and "CARDIOLOGY III;" 2) created a single-sided chestpiece that is indistinguishable from the MASTER CARDIOLOGY configuration mark; 3) sold his stethoscopes with free LITTMANN identification tags; 4) created logos that are confusingly similar to the LITTMANN QUALITY design mark; 5) created a new business name called "Lautenn;" and 6) created new designations using a root word identical or similar to "CARDIOLOGY" plus an Arabic numeral.  Defendant's use of 3M's trademarks in the listing titles of his eBay advertisements and in his Google AdWords campaigns is further evidence of purposeful intent to confuse.  This factor weighs in favor of likelihood of confusion.

### v. Actual confusion

114.  "[A]ctual confusion is not essential to a finding of trademark infringement, although it is positive proof of likelihood of confusion."  SquirtCo, 628 F.2d at 1091.  Evidence

of actual confusion may be presented in the form of evidence about anecdotal incidents of confusion or by survey evidence. Roederer, 2010 WL 3200034 at *30; Heartland Bank v. Heartland Home Fin., 335 F.3d 810, 821-22 (8th Cir. 2003) (Smith, J. & Hansen, J., concurring); McCarthy, supra, § 23:63.

### a. Anecdotal incidents of confusion

115. Realizing that evidence of actual confusion is difficult to obtain, anecdotal instances of confusion are powerful evidence of a likelihood of confusion. See Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1089-90 (7th Cir. 1988) (considering a handful of instances of actual confusion substantial proof of likelihood of confusion); Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 720 (3d Cir. 2004). Evidence of anecdotal instances of confusion was received at trial. Emails from Defendant's customers show that when some customers either placed an eBay bid for one of Defendant's stethoscopes or purchased one of Defendant's stethoscopes online, they believed they were buying genuine LITTMANN stethoscopes. See, e.g., Pls. Exs. 332, 334, 335. One customer expressly stated he believed he was buying a LITTMANN because the phrase "Littmann" in Defendant's advertisement led him to believe that the stethoscope was indeed a LITTMANN. Pls. Ex. 334. These documented instances of actual confusion are further evidence of likelihood of confusion.

### b. Survey evidence

116. Consumer surveys are another appropriate method for producing evidence of actual confusion. Mut. of Omaha, 836 F.2d at 400; Roederer, 2010 WL 3200034 at *30 (citing Stuart Hall Co., Inc. v. Ampad Corp., 51 F.3d 780, 790 (8th Cir. 1995)). "Because manifestations of actual confusion serve as strong evidence of a likelihood of confusion, and may, in fact, be the best such evidence, [surveys] should be given substantial weight unless seriously flawed." Mut.

of Omaha, 836 F.2d at 400 (citations omitted).

117.  The Poret survey: 1) was double-blind; 2) surveyed medical professionals who were likely to purchase stethoscopes online; 3) showed respondents Defendant's eBay advertisements in an almost identical format; and 4) used questions previously approved to determine likelihood of confusion under the Lanham Act.  The survey also controlled for "noise," and provided verbatim responses demonstrating confusion.

118.  Defendant attempted to impeach the survey by arguing that the surveys could have been completed by computerized robots in Moscow or other foreign locales – instead of by actual doctors and nurses in the United States.  Plaintiffs rebutted this contention with Poret's testimony that the company that provided the online panels of doctors and nurses collects a substantial amount of identifying information about these medical professionals before placing them on a panel.  To send survey respondents the $25 honorarium payment, the company must necessarily collect the addresses of these doctors and nurses.  In short, the survey was not substantially flawed, and it is accorded substantial weight.  Stuart Hall, 51 F.3d at 790.

119.  Poret calculated a 30% to 42% level of confusion based on his survey results. Survey results with lesser levels of confusion have been relied upon to support a finding of likelihood of confusion.  Roederer, 2010 WL 3200034 at *31; First Nat'l Bank, 655 F. Supp. 2d at 1000 (finding actionable confusion based on competing surveys demonstrating 13% to 19% confusion); Mut. of Omaha, 836 F.2d at 400 (finding actual confusion when survey evidence showed 10% confusion); see also Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 467 (4th Cir. 1996) ("[B]ut even if the true figure were only half of the [thirty to forty percent estimated by the survey], actual confusion would, in our view, nevertheless exist to a significant degree."); James Burrough, Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266, 279 (7th Cir. 1976) ("We cannot

agree that 15% is 'small.' Though the percentage of likely confusion required may vary from case to case, we cannot consider 15%, in the context of this case, involving the entire restaurant-going community, to be de minimus."); see also McCarthy, supra, § 23:2 ("[E]ven 11% of millions of potential buyers constitutes a large actual number of persons.") (citing Humble Oil & Refining Co. v. Am. Oil Co., 405 F.2d 803, 817 (8th Cir. 1969), cert. denied, 395 U.S. 905 (1969)).

120. Moreover, the verbatim responses from survey respondents are illuminating. See Roederer, 2010 WL 3200034 at *34. "The respondents' verbatim responses to [a] 'why' question may provide a window into consumer thought processes in a way that mere statistical data cannot." Id. (quoting McCarthy, supra, § 32:178). Here, the verbatim survey responses made obvious the inclusion of 3M's trademarks within Defendant's advertisements caused customers to believe that Defendant's stethoscopes were at the very least associated with the LITTMANN brand.

121. The Poret survey and the anecdotal evidence of actual confusion, taken together, strongly favor likelihood of confusion.

### vi. Degree of care

122. The final factor in the likelihood of confusion analysis is the degree of care exercised by purchasers, which requires consideration of the type of product, its cost, and conditions of purchase. SquirtCo, 628 F.2d at 1091; Faegre & Benson, LLP v. Purdy, 447 F. Supp. 2d 1008, 1016 (D. Minn. 2006). Courts must "stand in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." Luigino's, 170 F.3d at 832 (quoting Gen. Mills, 824 F. 2d at 627) (quotation marks omitted); Roederer, 2010 WL 3200034 at *34.

123.  The "quick and effortless nature" of the Internet makes it particularly unlikely that online consumers will avoid confusion through the exercise of due care. Coca-Cola Co. v. Purdy, No. 02-1782, 2005 WL 212797, *4 (D. Minn. Jan. 28, 2005), on remand from 382 F.3d 774 (8th Cir. 2004); see also Symantec Corp. v. Logical Plus, Inc., No. 06-7963, 2009 WL 3416178, *5 (N.D. Cal. Oct. 20, 2009);  GoTo.com, Inc. v. The Walt Disney Co., 202 F.3d 1199, 1206-07 (9th Cir. 2000).  Additionally, when a company's genuine products may be legitimately sold by many online vendors, the opportunities for confusion multiply.  Faegre, 447 F. Supp. 2d at 1016 ("Because it takes little effort to enter a web site, usually one click from a search engine's list, consumers 'are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership.'") (quoting Coca-Cola, 2005 WL 212797 at *4).  Here, LITTMANN stethoscopes are legitimately sold by many online vendors.

124.  Furthermore, as the product itself cannot be inspected before purchase, it is impossible for even the most diligent customer to meaningfully evaluate product quality.  Within online stethoscope advertisements, the display of marks identical to 3M's MASTER CARDIOLOGY and CARDIOLOGY III marks could lead even a careful medical professional familiar with stethoscopes to believe Defendant's stethoscopes are affiliated with the LITTMANN brand.  See Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center, 109 F.3d 275, 286 (6th Cir. 1997) ("[C]onfusingly similar marks may lead a purchaser who is extremely careful and knowledgeable about the instrument that he is buying to assume nonetheless that the seller is affiliated with or identical to the other party."); see also Morningside Group, Ltd. v. Morningside Capital Group, LLC, 182 F.3d 133, 143 (2d Cir. 1999) ("[W]hen, as here, there is a high degree of similarity between the parties' services and marks, 'the

sophistication of the buyers cannot be relied on to prevent confusion[.]'") (quoting McGregor-Doniger, Inc. v. Drizzle, Inc., 599 F.2d 1126, 1137 (2d Cir. 1979)).

125. Defendant's 1) bundling of his stethoscopes with genuine LITTMANN products, and 2) presenting marks identical to LITTMANN marks (i.e., MASTER CARDIOLOGY and CARDIOLOGY III) together with marks confusingly similar to LITTMANN marks (e.g., the Kila and Lautenn concentric circle logos), exacerbates the likelihood consumers will believe Defendant's stethoscopes are in some way associated with or sponsored by 3M or LITTMANN. Medical professionals who are knowledgeable about the online market for LITTMANN stethoscopes may be even more susceptible to confusion. Defendant's extensive use of 3M trademarks portrays him as an authorized 3M LITTMANN dealer. An understanding that genuine LITTMANN stethoscopes are often sold by authorized online dealers may delude even a knowledgeable consumer into believing Defendant is affiliated with 3M or LITTMANN. In sum, this factor weighs in favor of likelihood of confusion.

### vii. Conclusion as to likelihood of confusion

126. After evaluating the evidence presented at trial, juxtaposed against the factors of likelihood of confusion, the Court finds that 3M has shown a strong likelihood of confusion. 3M has proven their Lanham Act claims for infringement of 3M's MASTER CARDIOLOGY and CARDIOLOGY III marks by more than a preponderance of the evidence.

## C. Permanent Injunctive Relief With Respect to Trademark Infringement

127. An injunction against the use of an infringing trademark is a widely accepted remedy upon a finding of trademark infringement. 15 U.S.C. § 1116; Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc., 780 F.2d 1324, 1330 (8th Cir. 1985). Plaintiffs seek a permanent injunction barring Defendant from using MASTER CARDIOLOGY, CARDIOLOGY

III, or any of 3M's other trademarks. Plaintiffs further seek to bar Defendant from using any other mark, word, or name similar to any of 3M's trademarks.

128. A permanent injunction requires Plaintiffs to show: 1) that they have suffered an irreparable injury; 2) that remedies available at law, such as monetary damages, are inadequate to compensate for the injury; 3) that, considering the balance of hardships between the plaintiff and defendant, an equitable remedy is warranted; and 4) that the public interest would not be disserved by a permanent injunction. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006); Roederer, 2010 WL 3200034 at *37.

129. 3M's trademarks represent intangible assets of goodwill and reputation. See Gen. Mills, 824 F.2d at 625; Roederer, 2010 WL 3200034 at *38. The evidence at trial overwhelmingly supports a finding that LITTMANN has a reputation for high-quality stethoscopes. Further, Plaintiffs have developed and protected the goodwill associated with the LITTMANN brand since the early 1960s. Defendant's incursion on the reputation of the LITTMANN brand has caused irreparable injury to Plaintiffs. See Processed Plastic Co. v. Warner Commc'ns, 675 F.2d 852, 858 (7th Cir. 1982). This is the case regardless of the quality of Defendant's stethoscopes compared to LITTMANN stethoscopes. See Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 195-96 (3d Cir. 1990) ("If another uses [the plaintiff's mark], he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use.") (quoting Ambassador East, Inc. v. Orsatti, Inc., 257 F.2d 79, 82 (3d Cir. 1958)); Gen. Mills, 824 F.2d at 625; Roederer, 2010 WL 3200034 at *38. Here, however, evidence established that Defendant's stethoscopes are of significantly lower quality than LITTMANN stethoscopes. Plaintiffs have satisfied the irreparable harm requirement.

130.  Monetary damages are inadequate to compensate Plaintiffs for the irreparable harm to the LITTMANN brand's goodwill and reputation.  <u>See</u> <u>Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.</u>, 336 F.3d 801, 805 (8th. Cir. 2003) ("Harm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars."); <u>Processed Plastic</u>, 675 F.2d at 858 ("This and many other Courts have often recognized that the damages occasioned by trademark infringement are by their very nature irreparable and not susceptible of adequate measurement for remedy at law.")  Thus, Plaintiffs have met the second <u>eBay</u> requirement.

131.  Turning to the third requirement, it is likely Defendant will be harmed by entry of a permanent injunction because his marketing strategy encroaches heavily on 3M's trademarks and marks similar to 3M's trademarks.  However, Defendant has no right to infringe 3M's trademarks and has a duty to select trademarks that avoid confusion.  <u>See</u> <u>Ty, Inc. v. Jones Group, Inc.</u>, 237 F.3d 891, 902 (7th Cir. 2001); <u>Roederer</u>, 2010 WL 3200034 at *38.  Despite this duty, Defendant purposefully used marks identical to 3M's trademarks and marks that purposefully echo Plaintiffs' trademarks.  Defendant's purposeful use of 3M's trademarks likely commenced prior to his receipt of Plaintiffs' cease-and-desist letters, but certainly as of October 31, 2008. Notwithstanding this notice, Defendant continued to infringe 3M's marks.  Indeed, Defendant actually intensified the infringing nature of his marks by developing and marketing the Lautenn brand and the LAUTENN EXCELLENCE concentric circles logo.  Accordingly, Defendant's injury is self-inflicted.  <u>Roederer</u>, 2010 WL 3200034 at *38; <u>see</u> <u>Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.</u>, 290 F.3d 578, 596 (3d Cir. 2002).  The balance of the harms therefore supports entry of a permanent injunction.  <u>See</u> <u>Doctor's Assoc. v. Subway.SY LLC</u>, No. 09-3148, 2010 WL 3187899, *2 (D. Minn. July 30, 2010) (deciding

injunction necessary "in the face of defendant's unrelenting efforts to use and derive benefit from plaintiff's trademarks").

132. Finally, entry of an injunction serves the public interest by enforcing valid trademarks and preventing of consumer confusion in the marketplace. Doctor's Assoc., 2010 WL 3187899 at *2; see Coca-Cola Co. v. Purdy, 382 F.3d 774, 789-90 (8th Cir. 2004); Kos Pharms., 369 F.3d at 730-31 (holding a finding of likely confusion causes damage to the public interest); see Davidoff & CIE, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1304 (11th Cir. 2001). Once a likelihood of confusion is shown, the public interest is damaged if such confusion is allowed to continue. See Coca-Cola, 382 F.3d at 789 (stating public harmed where Internet search for plaintiff's name would be likely to turn up one or more of the defendant's websites); Am. Dairy Queen Corp. v. New Line Prods., Inc., 35 F. Supp. 2d 727, 733 (D. Minn. 1998); Davidoff, 263 F.3d at 1304; Kos Pharms., 369 F.3d at 730-31 (finding of likely confusion causes damage to the public interest).

133. Additionally, as a stethoscope is a medical device, it is in the public interest to prevent confusion between 3M's stethoscopes and Defendant's stethoscopes. See Kos Pharms., 369 F.3d at 716 ("greater care should be taken to avoid confusion in connection with medications which affect the health of the patient"); McLeod v. Hosmer-Dorrance, Inc., 192 U.S.P.Q. (BNA) 683, 686 (N.D. Cal. 1976) ("The product in question here is a medical device used in the care and treatment of serious injury; as such, there is even a greater public interest in insuring that no confusion exists as to the source of plaintiff's and defendant's products."). Medical professionals who mistakenly believe Defendant's stethoscopes have acoustical performance quality equal to LITTMANN stethoscopes may misdiagnose or fail to diagnose their patients. Thus, the fourth eBay factor is satisfied.

50

## 1. Appropriate Scope of Injunctive Relief

134. Plaintiffs have made the requisite showing for a permanent injunction. Injunctions in trademark actions should be tailored to fit the unlawful actions in the case. <u>Patsy's Brand, Inc. v. I.O.B. Realty, Inc.</u>, 317 F.3d 209, 220 (2d Cir. 2003). Trademark infringers may be required to keep a safe distance from infringing a plaintiff's marks. <u>See</u> <u>Taubman Co. v. Webfeats</u>, 319 F.3d 770, 779 (6th Cir. 2003) (quoting <u>Broderick & Bascom Rope Co. v. Manoff</u>, 41 F.2d 353, 354 (6th Cir. 1930)); McCarthy, <u>supra</u>, § 30:4. Furthermore, courts possess equitable discretion to fashion broad injunctive relief against a known infringer, especially in light of egregious behavior:

> Even if [the infringer] originally would have been entitled to use the marks, we hold that the unqualified injunction against their use is justified by [the infringer's] history of improper behavior. An injunction can be therapeutic as well as protective. In fashioning relief against a party who has transgressed the governing legal standards, a court of equity is free to proscribe activities that, standing alone, would have been unassailable.

<u>Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.</u>, 549 F. 2d 368, 390 (5th Cir. 1977) (citing <u>United States v. Loew's, Inc.</u>, 371 U.S. 38, 53 (1962)); <u>see</u> <u>Coca-Cola</u>, 382 F.3d at 791-92 (citing <u>Tonka Corp. v. Tonk-A-Phone, Inc.</u>, 805 F.2d 793, 795 (8th Cir.1986) (deciding injunction that broadly enjoined use of Tonka name was necessary to prevent continued infringement of that mark)); McCarthy, <u>supra</u>, § 30:4.

135. Because Defendant has deliberately and continuously infringed 3M's trademarks, a broad permanent injunction is appropriate. <u>See</u> <u>Doctor's Assoc.</u>, 2010 WL 3187899 at *2. This finding is buttressed by Defendant's escalating infringing activities even after Plaintiffs 1)

repeatedly requested Defendant cease his infringing activities and 2) notified Defendant of 3M's long-established trademark rights.  Id.

**D.  Permanent Injunctive Relief With Respect to the '865 Patent**

136.  This Court's prior Order determined Defendant infringed the '865 Patent, entitled "Ear Tips Having Molded-In Recesses for Attachment to A Stethoscope," which covers a special configuration of an ear tip that is designed to engage with the ear tubes of stethoscopes [Docket No. 151].  Courts may issue a permanent injunction upon a finding of patent infringement to prevent continued infringement.  35 U.S.C. § 283.  Courts consider and weigh the same four eBay factors addressed above in determining whether to award a permanent injunction to a prevailing plaintiff in a patent case.  eBay, 547 U.S. at 391; Verizon Servs. Corp. v. Vonage Holdings Corp., 503 F.3d 1295, 1310 (Fed. Cir. 2007); Spectralytics, Inc. v. Cordis Corp.; 650 F. Supp. 2d 900, 921 (D. Minn. 2009).

137.  First, despite the Court's previous finding of validity and infringement, Plaintiffs must show irreparable injury is likely absent an injunction.  See Torpso Hockey Int'l, Inc. v. Kor Hockey Ltd., 491 F. Supp. 2d 871, 881 (D. Minn. 2007) (rejecting Federal Circuit's presumption of irreparable harm in light of Supreme Court's holding in eBay that traditional principles of equity apply in patent cases).  3M has shown that it practices the '865 patent as the exclusive licensee, that 3M and Defendant are direct competitors for stethoscope sales, and that 3M risks lost sales to Defendant.  Plaintiffs have also established the risk of damage to the goodwill and reputation of the LITTMANN brand, and have shown that Defendant could infringe the patent in the future.  This evidence supports a finding of irreparable harm.  See EZ Gard Industries, Inc. v. XO Athletic Co., No. 07-4769, 2008 WL 1827490, *4 (D. Minn. Apr. 23, 2008) (finding

irreparable harm based on lost sales and impairment to plaintiff's goodwill and reputation from defendant's marketing); see also Verizon, 503 F. 3d at 1310-11 (affirming grant of permanent injunction based on evidence that patent owner will lose sales, suffer price erosion, or lose opportunities to sell other products). The first requirement is satisfied.

138. Plaintiffs have shown irreparable harm, and thus monetary damages are inadequate compensation. The second requirements is also satisfied.

139. Third, the balance of hardships favors entry of a permanent injunction. Defendant has asserted that he has designed new, non-infringing ear tips and no longer intends to sell the infringing ear tips. It therefore follows that an injunction will cause him no great hardship. See Spectralytics, 650 F. Supp. 2d at 921.

140. Finally, the public interest favors protection of valid patent rights, and the public has an interest in maintaining a strong patent system. EZ Gard, 2008 WL 1827490 at *5 (citing Smith Int'l, Inc. v. Hughes Tool Co., 718 F.2d 1573, 1581 (Fed. Cir.1983)). Therefore, this factor weighs in favor of the entry of a permanent injunction.

141. Application of the four-factor eBay test weighs in favor of a permanent injunction enjoining infringement of the '865 patent to prevent further harm to Plaintiffs.

**E. Attorneys Fees and Costs**

142. The Lanham Act authorizes "reasonable attorney fees to the prevailing party" in "exceptional cases." 15 U.S.C. § 1117(a). "Courts have defined the characteristics of exceptional cases with adjectives suggesting egregious conduct by a party." Doctor's Assoc., 2010 WL 3187899 at *4 (quoting Aromatique, Inc. v. Gold Seal, 28 F.3d 863, 877 (8th Cir. 1994); Roederer, 2010 WL 3200034 at *37 ("A case is exceptional if the infringer's actions were malicious, fraudulent, deliberate, or willful.") (citing Venture Tape Corp. v. McGills Glass

Warehouse, 540 F.3d 56, 64 (1st Cir. 2008)); see also Porous Media Corp. v. Pall Corp., 110 F.3d 1329, 1341 (8th Cir. 1997) (upholding attorney fee award where defendant's conduct was "deliberate and willful").  Here, Defendant purposefully used 3M's marks in an attempt to cause consumers to believe that the stethoscopes he sold were LITTMANN stethoscopes or were in some way associated with LITTMANN.  The intentional use of a well-known trademark in an attempt to "free-ride" on the goodwill of the trademark holder constitutes an exceptional case. Doctor's Assoc.,  2010 WL 3187899 at *4.

143.  Additionally, Defendant deliberately sold counterfeit MASTER CARDIOLOGY and CARDIOLOGY III stethoscopes and knowingly counterfeited the MASTER CARDIOLOGY configuration mark for his single-sided stethoscope.  Attorneys fees are properly awarded when conduct is deliberate.  See BASF Corp. v. Old World Trading Co., 41 F.3d 1081, 1099 (7th Cir. 1994).

144.  Furthermore, Defendant chose to offer LITTMANN identification tags and replacement diaphragms in tandem with his stethoscopes to create the false impression that he was associated with LITTMANN.  Defendant also refused to stop infringing after receiving 3M's cease and desist demands.  Instead, he intensified his infringement by creating the Lautenn brand and associated logos.  In addition, Defendant began using the designations CARDIOLOGY 3, CARDIOLOGY 5, CARDIOLOGY 7, and CARDIO 7 to sell stethoscopes, and the names LITTMANN and CARDIOLOGY III to sell "rebuild kits."  He also leveraged 3M's trademarks to gain rank in online search engine results and drive customers to his website, eBay listings, and Amazon listings.

145.  Collectively, Defendant's actions with respect to 3M's trademarks establish

deliberate and willful infringement, making this an "exceptional case" for purposes of § 1117(a).[6]

Consequently, Plaintiffs are awarded reasonable attorneys fees.

## F. Statutory Damages Under 15 U.S.C. § 1117(c)

146. Plaintiffs also seek an award of statutory damages for infringement and

counterfeiting of 3M's MASTER CARDIOLOGY and CARDIOLOGY III trademarks. Plaintiffs

request statutory damages pursuant to 15 U.S.C. § 1117(c), which states:

> In a case involving the use of a counterfeit mark (as defined in section 1116(d) of this title) in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a) of this section, an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of--

> (1) not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or

> (2) *if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark* per type of goods or services sold, offered for sale, or distributed, as the court considers just.

15 U.S.C. § 1117(c) (emphasis added). Having determined Defendant's use of the counterfeit

MASTER CARDIOLOGY and CARDIOLOGY III marks was willful, § 1117(c)(2) applies.

147. The Court is constitutionally barred from awarding statutory damages where the

---

[6] Plaintiffs alternatively seek reasonable attorneys fees under 15 U.S.C. § 1117(b). This section provides that, in the absence of extenuating circumstances, a court shall award attorneys fees in cases involving the use of a counterfeit mark if the defendant intentionally used the mark and knew that the mark was counterfeit. 15 U.S.C.§ 1117(b). Having found attorneys fees warranted under 15 U.S.C. § 1117(a), the Court will not conduct a § 1117(b) analysis. However, based on Defendant's willful infringement and counterfeiting of 3M's MASTER CARDIOLOGY and CARDIOLOGY III marks and his failure to prove extenuating circumstances, attorneys fees are likely warranted under § 1117(b) as well.

defendant did not waive his demand for a jury trial.

148. The Eighth Circuit has determined that when a trademark owner elects statutory damages as a remedy for trademark infringement, the defendant has a Seventh Amendment right to a jury determination of the amount of statutory damages. Bar-Meir v. N. Am. Die Casting Ass'n, 55 Fed. Appx. 389, 390-91 (8th Cir. 2003) (per curiam) (citing Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 353-54 (1998)); Microsoft Corp. v. Ion Techs. Corp., No. 01-1769, 2003 WL 21356084 at *6 (D. Minn. May 30, 2003) (relying upon Bar-Meir and Feltner in denying plaintiff's claim for a judicial award of statutory damages under § 1117(c)). Trademark defendants are entitled to a jury determination unless they waive their right to a jury trial. Id. Here, Defendant made a timely demand for a jury trial and has not waived his rights. To the contrary, Defendant has consistently asserted his right to a jury trial. As a result, Defendant is entitled to a jury determination on the issue of the appropriate amount of statutory damages. Bar-Meir, 55 Fed. Appx. 390-91; Microsoft, 2003 WL 21356084 at *6; see also Louis Vuitton Malletier v. Akanoc Solutions, Inc., No. C07-03952, 2010 U.S. Dist. LEXIS 85266, *43 (N.D. Cal. Mar. 19, 2010) (citing Bar-Meir for the proposition that a claim for statutory damages under the Lanham Act gives rise to the right to a trial by jury). Plaintiffs' claim for a judicially-determined award of statutory damages must therefore be denied.

149. Plaintiffs argue that the history and purpose of trademark law warrants an award of statutory damages without a jury determination. This argument is unavailing in light of clear and binding Eighth Circuit precedent. See Bar-Meir, 55 Fed. Appx. 390-91. Although the relief historically sought in trademark cases may have been equitable, this historical context does not trump binding precedent or Defendant's Seventh Amendment rights. See Dairy Queen, Inc. v. Wood, 369 U.S. 469, 472-73 (1962) (holding that where both legal and equitable issues are

presented in a single case, only under the most imperative circumstances is a right to a jury trial of legal issues lost through prior determination of equitable claims, and such rule applies whether the trial judge chooses to characterize legal issues presented as "incidental" to equitable issues or not).

150. The <u>Bar-Meir</u> court did not find the history of trademark law relevant in holding that a jury must determine the amount of statutory damages under the Lanham Act. Instead, the Eighth Circuit in <u>Bar-Meir</u> relied upon <u>Feltner v. Columbia Pictures</u>, a U.S. Supreme Court case decided in the context of the Copyright Act. <u>Bar-Meir</u>, 55 Fed. Appx. at 390-91. In <u>Feltner</u>, the Supreme Court abrogated the traditional rule that there was no right to a jury trial on the issue of statutory damages under the Copyright Act. 523 U.S. at 353. The <u>Feltner</u> court acknowledged the long tradition that "by the law the jury are judges of the damages." <u>Id.</u> (quoting <u>Lord Townshend v. Hughes</u>, 2 Mod. 150, 151 (C.P. 1677)). The court held: "There is clear and direct historical evidence that juries, both as a general matter and in copyright cases, set the amount of damages awarded to a successful plaintiff . . . . As a result, if a party so demands, a jury must determine the actual amount of statutory damages under [the Copyright Act] in order to preserve the substance of the common-law right of trial by jury." <u>Id.</u> at 355 (quotations omitted). The <u>Bar-Meir</u> court also looked to the Copyright Act for guidance in relying upon <u>Cass County Music Co. v. C.H.L.R., Inc.</u>, 88 F.3d 635, 641-42 (8th Cir. 1996) a pre-<u>Feltner</u> Eighth Circuit case holding that the amount of statutory damages in copyright cases must be determined by a jury. 55 Fed. Appx. 390-91.

151. In relying on <u>Feltner</u> and <u>Cass County</u> in <u>Bar-Meir</u>, the Eighth Circuit followed the lead of many courts that cite precedent under the Copyright Act for guidance in trademark cases. <u>Sara Lee Corp. v. Bags of N.Y., Inc.</u>, 36 F. Supp. 2d 161, 166 (S.D.N.Y. 1999) (collecting cases,

stating courts look to Copyright Act for guidance in trademark cases). <u>Accord</u>, <u>Brown v. Walker</u>, No. 1:06-218, 2010 WL 2346242, *7 (N.D. Ind. May 25, 2010); <u>Philip Morris USA, Inc. v. U.S. Sun Star Trading, Inc.</u>, No. 08-0068, 2010 WL 2133937, *10 (E.D.N.Y. Mar. 11, 2010); <u>Lorillard Tobacco Co. v. S&M Cent. Serv. Corp.</u>, No. 03-4986, 2004 WL 2534378, *4 (N.D. Ill. 2004) <u>Tommy Hilfiger Licensing, Inc. v. Goody's Family Clothing, Inc.</u>, No. 1-1934, 2003 WL 22331254, *28 (N.D. Georgia May 9, 2003); <u>Microsoft Corp. v. Software Wholesale Club, Inc.</u>, 129 F. Supp. 2d 995, 1008 (S.D. Tex. 2000); <u>see</u> 1-1 Intell. Prop. Couns. & Litig. § 1.08. This established practice is sound, as "[t]he Copyright Act is not only similar in principle to the [Lanham] Act but identical in much of its statutory damages language. Both authorize determinations within a broad range "as the court considers just," with the maximum increasing for "willful" infringements." <u>Sara Lee</u>; 36 F. Supp. 2d 166 (citations omitted); 15 U.S.C. § 1117(c)(2); 17 U.S.C. 504(c)(2) (copyright). This Court is bound by the <u>Bar-Meir</u> decision, which ignores the history of trademark law in favor of guidance from the modern-day Copyright Act. Plaintiffs' arguments to the contrary are unpersuasive.

152. Plaintiffs argue the language of § 1117(c)(2) supports their position that a jury determination is not required. As discussed above, the language of § 1117(c)(2) provides for statutory damages awards "as the court considers just." [7] 15 U.S.C. §§ 1117(c)(2); <u>see also</u> 15 U.S.C. §§ 1117(c)(1), (d) (identical language). At least one court has relied upon this language – even after <u>Feltner</u> – in deciding to judicially determine the amount of statutory damages for

---

[7] Plaintiffs stated in their Proposed Findings of Fact and Conclusions of Law that § 1117 (c) expressly states that "'the court' may award statutory damages 'subject to the principles of equity.'" This is plainly wrong, as evidenced by the text of § 1117(c) reproduced above in its entirety. Although § 1117*(a)* does include the phrase "subject to the principles of equity," that is a separate provision providing for recovery of defendant's profits, actual damages, and costs of the action – not statutory damages. <u>See</u> 15 U.S.C. §§ 1117 (a), (c).

trademark infringement under § 1117(c).  Diane Von Furstenburg Studio v. Snyder, No. 1:06cv1356, 2007 U.S. Dist. LEXIS 78915, *9 (E.D. Va. Oct. 23, 2007) ("Statutory damages [under the Lanham Act] are to be determined by the Court.").  Other judges have simply asserted, without discussion, that the issue of statutory damages under § 1117(c) is solely for the court.  Tobinick v. Scripps Clinic Med. Group, 81 Fed. Appx. 667, *17 (9th Cir. 2003) ("[T]he issue of statutory damages under 15 U.S.C. § 1117 (c) [is] a matter within the sole province of the court."); Doctor's Assoc., 2010 WL 3187899 at *4 (exercising discretion without discussing or distinguishing Bar-Meir).  These cases are unpersuasive, as this Court is bound by the Eighth Circuit's express holding that a jury determination is required on the amount of statutory damages under the Lanham Act.

153.  Plaintiffs further attempt to distinguish Bar-Meir, arguing that it should not apply here because the Bar-Meir court overturned the district court's entire damages award (consisting of both statutory and actual damages) without separately addressing whether statutory damages alone require a jury determination.  The Court disagrees.  The district court made distinctly separate awards of $75,000 in statutory damages and $50,000 in actual damages.  Bar-Meir v. N. Am. Die Casting Ass'n, No. 02-2661, slip op. at 2-3 (D. Minn. Dec. 26, 2002), aff'd in part, rev'd in part, 55 Fed. Appx. 390-91.  The Eighth Circuit could easily have distinguished between the two types of awards, but chose not to do so.  55 Fed. Appx. 390-91; see Cass County, 88 F.3d at 643.  Instead, the Bar-Meir court held that a jury determination was constitutionally required for both actual and statutory damages.  55 Fed. Appx. 390-91.  In sum, Plaintiffs' attempts to distinguish Bar-Meir fail.  As Defendant has not waived his right to a jury trial, Plaintiffs' claim

for statutory damages is denied.[8]

## V. CONCLUSION

Based on the foregoing, an examination of Defendant's online sales presence as of the date of this Order, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The Court finds in favor of Plaintiffs 3M Company and 3M Innovative Properties on their claim of trademark infringement. The Court awards injunctive relief as follows:

   a. Defendant, including his agents, servants, employees, attorneys, distributors, and all persons controlling, controlled by, or in active concert or participation with, through, or under him, is hereby enjoined from using or causing to be used any of the infringing marks and any other marks, names, or designations that are confusingly similar to 3M's Marks, including LITTMANN, LITTMANN QUALITY Stylized L, Stylized L, CARDIOLOGY III, MASTER CARDIOLOGY, 3M and the MASTER CARDIOLOGY configuration mark (hereafter collectively the "3M Mark" or "3M Marks"), in any manner, including, without limitation, as trademarks, service marks (or any other type of designation) trade names, business names, designations, descriptors, product identity statements, product configurations, domain names, email addresses, keywords, or metatags, on products, packaging, or shipping containers, in product literature, promotional literature, or advertisements, on websites, Internet sites, online auctions or social networking sites.

---

[8] Had Defendant waived his right to a jury trial, however, the Court would have awarded Plaintiffs significant damages for each mark. Under § 1117(c)(2), Plaintiffs are entitled to statutory damages of not more than $2 million for the MASTER CARDIOLOGY mark used in relation to stethoscopes, and not more than $2 million for the CARDIOLOGY III mark used in relation to stethoscopes. As discussed above, Defendant's infringement with respect to 3M's MASTER CARDIOLOGY and CARDIOLOGY III trademarks was purposeful and egregious. Defendant's conduct with respect to 3M's other LITTMANN-related trademarks was also purposeful and egregious. Defendant's actions aimed to appropriate the goodwill associated with the LITTMANN brand for his own financial gain. He intensified his infringement after receiving cease-and-desist letters and notice of 3M's trademark rights. Defendant also misrepresented the quality of his stethoscopes compared to LITTMANN stethoscopes, creating a potential danger for patients examined by medical professionals using Defendant's stethoscopes. For these reasons, if the Court were empowered to award statutory damages, the Court would award Plaintiffs in excess of $200,000 for each mark.

b.      Defendant and his agents, servants, employees, attorneys, distributors, and all persons controlling, controlled by, or in active concert or participation with, through, or under him, are further enjoined from committing any act calculated to or likely to cause the public to believe Defendant or his goods or services are connected, sponsored, affiliated or associated with 3M or 3M IPC, and from otherwise unfairly competing with Plaintiffs. Specifically, Defendant is enjoined from selling stethoscope parts marketed as companions to genuine 3M stethoscopes or stethoscope products, including "re-build kits" or accessories designed to fit with or be compatible with 3M products.

c.      Defendant and his agents, servants, employees, attorneys, distributors, and all persons controlling, controlled by, or in active concert or participation with, through, or under him, are further enjoined from any other acts that directly or indirectly infringe or induce or contribute to the infringement of any of the 3M Marks.  By way of example only, Defendant shall not use in any manner whatsoever any mark, name, designation, or configuration that:

(i)     Is referred to in the Findings of Fact above or depicted in images referenced therein (including the images depicted in Figures 1-22 above);

(ii)    Consists of the letter "L," begins with the letter "L" or in which the letter "L" is prominent;

(iii)   Contains consecutive letter "Ts" or consecutive letter "Ns;"

(iv)    Uses a single letter, character, or symbol inside a circle or concentric circles;

(v)     Includes the term "MASTER" or any term confusingly similar thereto;

(vi)    Includes the term "CARDIOLOGY," "CARDIOLOGIST," or "CARDIO" either individually or preceded by or followed by a number (whether Arabic or Roman or spelled out), with or without any other term or word;

(vii)   Includes the term "3M," or the phonetic equivalent thereof, or characters that are confusingly similar to "3M";

(viii)  Is substantially similar to the shape and look of the chestpiece of the MASTER CARDIOLOGY stethoscope, or is substantially similar to or would create a likelihood of confusion with the configuration

61

registered by 3M in U.S. TM Registration No. 2,486,748 or the images depicted in Figures 3, 8, 9, 19, 20, or 21;

(viiii) Includes terms identical or substantially similar to any term 3M has used in its stethoscope designations, either individually or preceded by or followed by a number (whether Arabic or Roman or spelled out), including but not limited to "SE," "Classic," "Class," "Select," "STC," and "Soft Touch."

d.      Defendant, including his agents, servants, employees, attorneys, distributors, and all persons controlling, controlled by, or in active concert or participation with, through or under him, is hereby enjoined from the import, offer for sale, and sale of the infringing ear tips and any other products only colorably different from the infringing ear tips. Defendant is further enjoined from any other acts that directly or indirectly infringe or contribute to the infringement of any claim of the '865 Patent.

e.      Because of the likelihood of continuing customer confusion engendered by Defendant's sale of genuine LITTMANN replacement parts and accessories in conjunction with non-LITTMANN stethoscopes and because of his history of infringing conduct, Defendant, including his agents, servants, employees, attorneys, distributors, and all persons controlling, controlled by, or in active concert or participation with, through, or under him, is hereby enjoined from the sale, distribution, and offer for sale of LITTMANN brand products, including stethoscopes and any replacement parts and accessories, such as name tags, diaphragms, rims, ear tips, and gaskets as well as training materials and software.

f.      Defendant, including his agents, servants, employees, attorneys, distributors, and all persons controlling, controlled by, or in active concert or participation with, through, or under him, is further enjoined from selling any existing stock of infringing chestpieces, chestpieces substantially similar to the infringing chestpieces, and all stethoscopes that include infringing or substantially similar chestpieces. Defendant is further enjoined from selling any existing stock of LITTMANN name tags, diaphragms, or other LITTMANN brand replacement parts and accessories; all stethoscopes and parts bearing any infringing mark or mark confusingly similar to the 3M Marks (including, but not limited to, all marks depicted in Figures 1-22); and all infringing ear tips.

g.      On or before 30 days from the date of this Order, Defendant shall destroy all packaging, advertising, marketing, and collateral materials that contain any 3M Marks or any mark, name, or designation that infringes or is similar to any 3M Marks, including but not limited to any such materials that contain or refer to any of the infringing marks or any of the marks

depicted in Figures 1-22 above. Defendant shall remove all references to or use of the 3M Marks and any mark, name, or designation that infringes any 3M Mark from any and all websites, Internet sites, online auction sites, social networking sites and other online applications containing content directly or indirectly under his control, and shall certify his compliance with this paragraph in writing and under oath. If any other packaging, advertising, marketing, or collateral materials containing or referring to any 3M Mark or any mark, name, or designation that infringes or has been deemed confusingly similar to any 3M Mark (including, but not limited to, all marks depicted in Figures 1-22 above), come or are brought to Defendant's attention after the date of such certification, Defendant shall promptly destroy such other materials and remove such references.

h.  Defendant is enjoined from giving away, transferring, or donating any of the items referenced in paragraphs (a) through (g), above.

i.  On or before 45 days from the date of this Order, Defendant shall file with the Court a certification under oath attesting to and detailing Defendant's compliance with this Order.

j.  Plaintiffs may contact all "identified purchasers" of Defendant's stethoscopes, infringing ear tips, and LITTMANN accessories. "Identified purchasers" are those purchasers identified in Defendant's business records in Plaintiffs' possession as of the date of this Order. Plaintiffs may contact the identified purchasers for the sole purpose of informing the identified purchasers that 1) Defendant has no connection, association, or affiliation with 3M or LITTMANN, and 2) that stethoscopes purchased from Defendant have inferior acoustical performance, especially at low frequencies.

2.  Plaintiffs' claim for reasonable attorneys fees and costs is **GRANTED**.[9]

3.  Plaintiffs' claim for statutory damages is **DENIED**.

---

[9] Within the next 30 days, Plaintiffs shall submit an affidavit for attorneys fees and costs, which shall include a detailed accounting of the fees and costs Plaintiffs incurred during this litigation. Defendant is allowed 10 days after receiving the affidavit to respond to Plaintiffs' submission.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: November 24, 2010.